Tanya MIXON, Denise Thomas, and the National Association for the Advancement of Colored People, Plaintiffs–Appellants,

v.

The STATE OF OHIO and Michael White, Mayor of the City of Cleveland, Defendants–Appellees.

No. 98–3368.

United States Court of Appeals, Sixth Circuit.

Argued June 8, 1999.

Decided Sept. 30, 1999.

George L. Forbes (briefed), Scott H. Schooler (argued and briefed), Forbes, Fields & Associates Co. L.P.A., Cleveland, OH, for Tanya Mixon and National Association for the Advancement of Colored People.

George L. Forbes (briefed), Forbes, Fields & Associates Co. L.P.A., Cleveland, OH, for Denise Thomas.

Roger F. Carroll (argued and briefed), James G. Tassie (briefed), Judith L. French (briefed), Stephen P. Carney (briefed), Office of the Attorney General of Ohio, Education Section, Columbus, OH, for State of Ohio.

Frederick R. Nance (argued and briefed), Steven A. Friedman (briefed), Squire, Sanders & Dempsey, Cleveland, OH; Sylvester Summers, Jr., City of Cleveland Law Department, Cleveland, OH, for Michael R. White.

Before: KEITH, KENNEDY, and GILMAN, Circuit Judges.

## OPINION

KENNEDY, Circuit Judge.

Plaintiffs in these two consolidated cases are voters and taxpayers of the Cleveland School District who seek to have Ohio Substitute House Bill 269 ("H.B.269") declared unconstitutional.[1] H.B. 269

---

1. This case began with two complaints, the Spivey and Mixon Complaints, which the district court consolidated. On September 4, 1998, Plaintiffs Spivey, Carte, and Young voluntarily dismissed their appeal. Thus, Mixon, Thomas, and the NAACP are the remaining Plaintiffs before the court. Mixon, a registered voter in the City of Cleveland, is an African–American mother whose child attends school in the Cleveland School District. Thomas, a registered voter in the City of Garfield Heights, is an African–American mother whose child attends school in the Cleveland School District. The NAACP is a non-profit civil rights organization that represents the civil rights of African–Americans throughout the United States. Defendants have not challenged on appeal the standing of the NAACP, which presumably meets the test set forth in *Hunt v. Washington State Apple Adver. Comm.*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), for determining whether an organization may sue on behalf of its members. *Hunt*, 432 U.S. at 343, 97 S.Ct. at 2441 (an association may sue "when (a) its members would otherwise have standing to sue in their own

changed the composition and number of the Cleveland School Board by allowing the Mayor of Cleveland to appoint a new school board for the Cleveland School District, consisting of Cleveland and four adjacent areas. Prior to this legislation, school district residents voted in a public election for school board members. Plaintiffs brought claims under (i) the Equal Protection Clause of the United States Constitution; (ii) 42 U.S.C. § 1983, alleging violations of the Equal Protection Clause of the United States Constitution, (iii) the Voting Rights Act, 42 U.S.C. § 1971, (iv) the Ohio Constitution and (v) Ohio common law. All parties filed motions for judgment on the pleadings. On March 6, 1998, the district court granted defendants' motions for judgment on the pleadings as to all causes of action and Plaintiffs timely filed their appeal to this court. On September 8, 1998, this court denied Plaintiffs' request for an emergency order enjoining the operation of H.B. 269. After careful consideration of the merits of this case, we agree with the district court's well-reasoned determinations. We hold, however, that the Eleventh Amendment bars the state law and federal Equal Protection claims against the State of Ohio and we **DISMISS** those claims. We **AFFIRM** the district court in all other respects.

## I. BACKGROUND

The history behind this case is detailed and complex, stretching back nearly twenty years to a time when a federal district court in Ohio issued a desegregation order for the Cleveland public schools. On August 31, 1976, Federal District Court Chief Judge Battisti, after a lengthy bench trial, determined that the Ohio and Cleveland Boards of Education, the Cleveland School District, the Ohio Department of Education, and the State Superintendent had condoned and contributed to a policy of segregation in the Cleveland public schools. That same day, he permanently enjoined the board of education "from discriminating on the basis of race in the operation of the public schools of the City of Cleveland, and from creating, promoting, or maintaining racial segregation in any school or other facility in the Cleveland School System." *Reed v. Rhodes*, 422 F.Supp. 708, 797 (N.D.Ohio 1976).

On February 6, 1978, Judge Battisti issued a remedial order that required the defendants to implement a "comprehensive, systemwide plan of actual desegregation" and the Cleveland schools remained under the supervision of the district court. *Reed v. Rhodes*, 455 F.Supp. 546, 568 (N.D.Ohio 1978). From 1978 through the early 1990s, the parties continued to litigate the specifics of the remedial order and eventually entered into a settlement agreement in March, 1994. After a detailed hearing, the district court converted the settlement agreement into an enforceable Consent Decree. *Reed v. Rhodes*, 869 F.Supp. 1274 (N.D.Ohio 1994).

Despite the school district's successful compliance with the desegregation orders, however, political turmoil threatened the internal affairs of the Cleveland School District in the early 1990s. During this time period, the school district adopted a new educational program for the Cleveland schools called Vision 21, which became a focal point of the Consent Decree. Although Vision 21 appeared promising for revitalizing the school district, as evidenced by its incorporation into the Consent Decree, the program created turmoil within the Cleveland Board of Education and spawned internal feuding among the Mayor, the Superintendent of the Cleveland School District, and the local Board of Education, all of which led to the "total fiscal and administrative collapse" of the Cleveland School District. *See Reed v.*

right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires participation of individual members in the lawsuit."). *See also New York State Club Assoc., Inc. v. City of New York*, 487 U.S. 1, 9–10, 108 S.Ct. 2225, 2232, 101 L.Ed.2d 1 (1988) (reaffirming *Hunt*).

*Rhodes*, 934 F.Supp. 1533, 1538–39 (N.D.Ohio 1996).

As a result of this infighting, the district court, on March 3, 1995, directed the State Board of Education and the State Superintendent to "assume immediate supervision and operational, fiscal and personnel management of the District." *See Reed v. Rhodes*, 934 F.Supp. 1533, 1560 (App.A) (N.D.Ohio, 1996). On May 8, 1996, the district court modified the school desegregation Consent Decree and terminated judicial supervision of student-school assignments. *See id.* at 1558.[2] This court recently affirmed that decision. *Reed v. Rhodes*, 179 F.3d 453, 473 (6th Cir.1999). Finally, on July 17, 1998, the district court ordered the State Superintendent to return control of the Cleveland schools to the City of Cleveland as of September 9, 1998.

In the meantime, however, the Ohio Legislature drafted legislation that altered the composition and selection of the Cleveland School Board. On July 22, 1997, the Ohio Legislature passed H.B. 269, Ohio Rev.Code Ann. ("O.R.C.") §§ 3311.71–.77 (Anderson 1998), which created "municipal school districts."[3] The legislation defines a municipal school district as "a school district that is or has ever been under a federal court order requiring supervision and operational, fiscal, and personnel management of the district by the state superintendent of public instruction." O.R.C. § 3311.71(A)(1). Upon the statute's enactment, the Cleveland School District fell within the statute's definition and became a municipal school district. Plaintiffs in this action challenge the constitutionality and legitimacy of H.B. 269.

To fully understand Plaintiffs' arguments, a brief overview of the statute itself is necessary. Once a federal court releases a targeted school district from its super-

vision order, a new nine-member school board assumes control of the district schools. O.R.C. § 3311.71(B). The mayor of the municipal corporation having the greatest portion of territory in the municipal school district appoints these nine members. O.R.C. § 3311.71(A)(2), (B). In this case, five areas compose the Cleveland City School District: The Villages of Bratenahl, Linndale, and Newburgh Heights, a portion of Garfield Heights, and the City of Cleveland. The Mayor of the City of Cleveland appoints the school board because the City of Cleveland has the greatest portion of territory within the municipal school district.

The mayor selects the new nine members from a slate of at least eighteen nominees selected by a nominating panel. At least three of the members of the nominating panel must reside in the municipal school district but not in the municipal corporation containing the greatest portion of the district's territory, *i.e.*, from the four areas besides Cleveland, namely Bratenahl, Linndale, Newburgh Heights or Garfield Heights. The statute also requires that the nominating panel consist of the following persons: (i) Three parents or guardians of children attending the schools in the municipal school district who are appointed by the district's parent-teacher organization or a similar organization that the State Superintendent selects; (ii) Three persons appointed by the mayor (*i.e.*, the Mayor of Cleveland); (iii) One person appointed by the president of the legislative body of the municipal corporation containing the greatest portion of the municipal school district's territory (*i.e.*, Cleveland); (iv) One teacher appointed by the collective bargaining representative of the school district's teachers; (v) One principal appointed through a vote, conducted by the State Superintendent, of the school

---

**2.** The case was assigned to Circuit Judge Krupansky after the death of Judge Battisti in October, 1994. The case was later transferred to Chief Judge George W. White on March 1, 1996. Judge Krupansky issued the

May 8, 1996 order based on the hearing held before the reassignment of Chief Judge White.

**3.** The Governor of Ohio signed the bill into law on August 13, 1997.

district's principals; and (vi) One representative of the business community appointed by an organized collective business entity selected by the mayor; (vii) One president of a public or private institution of higher education located within the municipal school district appointed by the State Superintendent. O.R.C. § 3311.71(C).

In addition, H.B. 269 provides specific limitations on the nominees. No nominee may hold elected office and all nominees must reside within the municipal school district. O.R.C. § 3311.71(D). At least one member of the selected school board must reside in the municipal school district but not in the municipal corporation containing the greatest portion of the district's territory, i.e., one member must reside in one of the other four areas besides Cleveland. O.R.C. § 3311.71(D). Four of the nine members also must have displayed, prior to their appointment, significant expertise in either the education field, finance, or business management. O.R.C. § 3311.71(D). Additionally, any president of a state university or community college located within the municipal school district acts as a nonvoting ex officio member of the school board. O.R.C. § 3311.71(G). During the first thirty months of the new school board's tenure, the mayor also appoints a chief executive officer ("CEO") and fills any vacancies in that position. After the first thirty months have expired, the mayor appoints a CEO and fills any vacancies in that position only with the concurrence of the school board. O.R.C. § 3311.72(B)(1)-(2).

After the school board has been in existence for four years, the statute mandates that a referendum election be held to determine whether the electorate of the municipal school district chooses to continue with an appointed school board. The election must occur in the first even-numbered year occurring at least four years after the school board has assumed control of the municipal school district. O.R.C. § 3311.73(A). If the voters choose to reinstate an elected School Board, then the voters will elect a new seven-member board of education in the next regular election occurring in an odd-numbered year. In that election, voters will elect four members to four year terms and three members to two year terms. O.R.C. § 3311.73(D). If, however, the voters choose to retain an appointed School Board, then the mayor will appoint a new board on the immediately following first day of July. O.R.C. § 3311.73(C).

As soon as the State Superintendent returned control of the Cleveland public schools to the City of Cleveland on September 9, 1998, the Cleveland School District immediately fell within the definition of "municipal school district" under the provisions of H.B. 269. The Mayor of Cleveland appointed a new nine member school board, which currently runs the school district. The earliest referendum election for the Cleveland School District presumably would occur in November, 2002, a little more than four years after the initial appointment of the Cleveland School Board. If voters choose to return to an elected school board, then the voters would wait one year, until November, 2003, to vote for a new seven-member school board.[4] Plaintiffs contend that H.B. 269 violates both the state and federal constitutions, the Voting Rights Act, and Ohio common law. We address their arguments in turn.

## II. SOVEREIGN IMMUNITY

The Eleventh Amendment of the United States Constitution[5] expressly pro-

---

**4.** Plaintiffs thus argue that they must wait five years before they again have the opportunity to elect their school board members.

**5.** The Eleventh Amendment states:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens

hibits citizens from suing the States in federal court subject to a few exceptions. *See Alden v. Maine,* —— U.S. ——, 119 S.Ct. 2240, 2266–68, 144 L.Ed.2d 636 (1999); *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). Both *Alden* and *Seminole Tribe,* two of the Supreme Court's more recent pronouncements on the Eleventh Amendment, hold that Plaintiffs may directly sue a State in federal court when a State consents to suit or the case concerns a statute passed pursuant to Section 5 of the Fourteenth Amendment, such as Title VII claims. *Alden,* 119 S.Ct. at 2267; *Seminole Tribe,* 517 U.S at 59, 116 S.Ct. at 1125; *City of Boerne v. Flores,* 521 U.S. 507, 516–36, 117 S.Ct. 2157, 2162–72, 138 L.Ed.2d 624 (1997); *Fitzpatrick v. Bitzer,* 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976). Some of Plaintiffs' claims against the State of Ohio here are under the Ohio Constitution and Ohio common law. Although Ohio has statutorily waived its state sovereign immunity against certain state court actions by consenting to state suits in the Ohio Court of Claims, *see* O.R.C. § 2743.02(A) (Anderson Supp.1998), a State may retain Eleventh Amendment immunity from suit in federal court even if it has waived its immunity and consented to be sued in its state courts. *Ford Motor Co. v. Dep't of Treasury,* 323 U.S. 459, 465, 65 S.Ct. 347, 351, 89 L.Ed. 389 (1945). Ohio has not waived its sovereign immunity in federal court. *Johns v. Supreme Court of Ohio,* 753 F.2d 524, 527 (6th Cir.1985); *State of Ohio v.*

*Madeline Marie Nursing Homes,* 694 F.2d 449, 460 (6th Cir.1982).

■ Despite the fact that the Ohio Attorney General has not pressed the immunity question on appeal, we "may sua sponte raise the issue of lack of jurisdiction because of the applicability of the eleventh amendment." *Ritter v. Univ. of Michigan,* 851 F.2d 846, 851 (6th Cir. 1988); *see also Ford Motor Co.,* 323 U.S. at 467, 65 S.Ct. at 352 (the Supreme Court will consider issues under the Eleventh Amendment "even though urged for the first time" on appeal to that Court); *Wilson–Jones v. Caviness,* 99 F.3d 203, 206 (6th Cir.1996) ("[N]either the litigants' consent, nor oversight, nor convenience can justify a court's exercise of illegal power.").[6] In the instant case, we find nothing in the record to indicate that Ohio consented to this suit.[7] Indeed, Ohio pled the Eleventh Amendment as an affirmative defense in its pleadings. Nor does the fact that Plaintiff seeks only injunctive relief allow the suit to proceed, for "the relief sought by a plaintiff suing a State is irrelevant to the question whether the suit is barred by the Eleventh Amendment." *Seminole Tribe,* 517 U.S. at 58, 116 S.Ct. at 1124.

■ Additionally, Plaintiffs did not sue a state official and thus are not entitled to federal jurisdiction under the limited exception in *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) (Plaintiffs may seek injunctive relief in federal court against a state officer for a violation of federal law). Further, Plaintiffs must al-

---

of another State, or by Citizens or Subjects of any foreign state.

**6.** The Ohio Attorney General contends that any analysis under the Eleventh Amendment is unnecessary because all of the claims may proceed against the Mayor of Cleveland and the State would have intervened as a party in the lawsuit to uphold the state legislation. Even so, the State did not intervene and we do not know the outcome had the State chosen to do so. On the pleadings before us, we must address the immunity issue because it is jurisdictional.

**7.** A State usually consents to waive its Eleventh Amendment immunity by express language in state legislation. *See Caviness,* 99 F.3d at 206 n. 1. Ohio only allows a waiver of sovereign immunity by its legislature or its courts. *See Madeline Marie,* 694 F.2d at 460 ("[T]here can be no waiver of Ohio's sovereign immunity without legislation by the General Assembly...."); *Schenkolewski v. Cleveland Metroparks System,* 67 Ohio St.2d 31, 426 N.E.2d 784, 787 (1981) (courts may modify or abrogate sovereign immunity).

lege a violation of a congressional statute enacted under § 5 to state a claim against a State under the Equal Protection Clause. *See Bitzer*, 427 U.S. at 455, 96 S.Ct. at 2671 ("Were it not for the fifth section of [the Fourteenth A]mendment, there might be room for argument that the first section is only declaratory of the moral duty of the State.") They have not done so here. Since the federal court had no jurisdiction under *Seminole Tribe* over the state law or the federal Equal Protection Clause claims, we accordingly dismiss those claims against the State of Ohio.

We turn next to the claim against the State of Ohio under the Voting Rights Act, which Congress enacted under Section 2 of the Fifteenth Amendment. *See South Carolina v. Katzenbach*, 383 U.S. 301, 325, 86 S.Ct. 803, 816–17, 15 L.Ed.2d 769 (1966). Although *Alden* and *Seminole Tribe* limit the situations in which a State may be sued in federal court, both cases recognize that Congress may abrogate a State's immunity when enacting "appropriate" legislation under the enforcement provision, § 5, of the Fourteenth Amendment. *See Bitzer*, 427 U.S. at 456, 96 S.Ct. at 2671 (Under § 5 of the Fourteenth Amendment "Congress is expressly granted authority to enforce 'by appropriate legislation' the substantive provisions of the Fourteenth Amendment, which themselves embody significant limitations on state authority."). "In order to determine whether Congress has abrogated the States' sovereign immunity, we ask two questions: first, whether Congress has 'unequivocally expresse[d] its intent to abrogate the immunity,' *Green v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1985); and second, whether Congress has acted 'pursuant to a valid exercise of power.'" *Seminole Tribe*, 517 U.S. at 55, 116 S.Ct. at 1123.

■ With respect to whether Congress intended to abrogate the States' sovereign immunity under the Voting Rights Act, we believe the language and purpose of the statute indicate an affirmative response. The language of Section 2 of the Act, 42 U.S.C. § 1973, specifically prohibits "any State or political subdivision" from discriminating against voters on the basis of race.

The second part of the inquiry requires us to determine whether Congress properly acted pursuant to a valid exercise of power when it enacted the Voting Rights Act. Section 2 of the Fifteenth Amendment mirrors Section 5 of the Fourteenth Amendment, both of which grant Congress the power to enforce the Amendments.[8] In *City of Rome v. United States*, 446 U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980), the Supreme Court, following a discussion of Congress' ability to abrogate a State's sovereign immunity under § 5 of the Fourteenth Amendment, addressed the Voting Rights Act:

> We agree with the court below that Fitzpatrick stands for the proposition that principles of federalism that might otherwise be an obstacle to congressional authority are necessarily overridden by the power to enforce the Civil War Amendments "by appropriate legislation." Those Amendments were specifically designed as an expansion of federal power and an intrusion on state sovereignty. Applying this principle, we hold that Congress had the authority to regulate state and local voting through the provisions of the Voting Rights Act.

*City of Rome*, 446 U.S. at 179–80, 100 S.Ct. at 1562–63. As this passage illustrates, Congress designed the Act "to implement the Fifteenth Amendment and, in some respects, the Fourteenth Amendment," intending to impose its authority on the States. *See United States v. Bd. of*

---

8. Nearly identical enforcement clauses appear in some of the other Amendments: the 13th, abolishing slavery; the 19th, prohibiting gender discrimination in voting; the 23rd, providing for presidential voting in the District of Columbia; the 24th, eliminating the poll tax; and the 26th, granting the right to vote to all citizens 18 years or older.

*Comm'rs of Sheffield, Ala.*, 435 U.S. 110, 126–27, 98 S.Ct. 965, 976–77, 55 L.Ed.2d 148 (1978).

■ More recently in *Flores*, the Supreme Court examined Congress' power under the Fourteenth Amendment's enforcement provision with regard to the Religious Freedom Restoration Act ("RFRA"). In holding that the RFRA was an impermissible exercise of congressional power, the Court contrasted the RFRA against the Voting Rights Act:

> Legislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into "legislative spheres of autonomy previously reserved to the States." For example, the Court upheld a suspension of literacy tests and similar voting requirements under Congress' parallel power to enforce the provisions of the Fifteenth Amendment as a measure to combat racial discrimination in voting, despite the facial constitutionality of the tests.... We have also concluded that other measures protecting voting rights are within Congress' power to enforce the Fourteenth and Fifteenth Amendments, despite the burdens those measures place on the States.

*Flores*, 521 U.S. at 518, 117 S.Ct. at 2163 (citations omitted). As in *City of Rome*, the Court's decision aligns Congress' authority to abrogate a State's sovereign immunity under the Fourteenth Amendment to the similar provision in the Fifteenth Amendment. Considering that the two enforcement provisions are identical and both Amendments share the common goal of eradicating discrimination, we believe Congress may abrogate sovereign immunity by passing legislation under the Fifteenth Amendment. We can see no reason to treat the enforcement provision of the Fifteenth Amendment differently than the identical provision of the Fourteenth Amendment and the Supreme Court has

not held to the contrary. Therefore, we have jurisdiction over Plaintiffs' claim under the Voting Rights Act against the State of Ohio.

■ Further, all of Plaintiffs' claims may proceed against the Mayor of Cleveland. While Plaintiffs cannot seek injunctive relief in federal court against a *state* officer for a violation of *state* law, *Pennhurst State School and Hosp. v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), in some situations they may do so to obtain injunctive relief under federal law. *See Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *cf. Seminole Tribe*, 517 U.S. at 73–76, 116 S.Ct. at 1132–33 (limiting *Young* and holding that the *Young* doctrine ·may not be used to enforce the Indian Gaming Regulatory Act, 25 U.S.C. § 2710(d)(1)(C)). The Supreme Court, however, noted specifically that sovereign immunity "bars suits against States but not lesser entities" in federal and state court. *Alden*, 119 S.Ct. at 2267. Here, the Mayor of Cleveland is a municipal actor, not a state official, and does not fall under the State's broad umbrella of sovereign immunity unless Ohio considers the Mayor an "arm of the State." *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977). Although the Mayor of Cleveland derives his authority from the State's enabling act, he does not perform a state function in this case. Instead, the Mayor of Cleveland represents a "municipal corporation," which the Ohio Legislature defined as a "political subdivision" expressly excluded from sovereign immunity. *See* O.R.C. § 2743.01. Consequently, the Mayor of Cleveland is not entitled to claim the State's sovereign immunity ·and we have jurisdiction over both the federal ·and state claims against him.

### III. DISCUSSION

### A. Standard of Review

■ We review de novo a district court's grant of a motion for judgment on

the pleadings under Fed.R.Civ.Pro. 12(c) in the same manner as a motion to dismiss under Rule 12(b)(6). *See Grindstaff v. Green*, 133 F.3d 416, 421 (6th Cir.1998). We "construe the complaint in the light most favorable to the plaintiff[s] ... and determine whether the plaintiff[s] undoubtedly can prove no set of facts in support of the claims that would entitle [them to] relief." *Id.* We accept all of Plaintiffs' factual allegations as true, *United States v. Moriarty*, 8 F.3d 329, 332 (6th Cir.1993), but we need not accept as true legal conclusions or unwarranted factual inferences. *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir.1987).[9]

## B. The Referendum Provision of the Ohio Constitution

Plaintiffs first allege that H.B. 269 violates the referendum proviso found in Article VI, Section 3 of the Ohio Constitution, which provides:

Provision shall be made by law for the organization, administration and control of the public school system of the state supported by public funds; provided, that each school district embraced wholly or in part within any city shall have the power by referendum vote to determine for itself the number of members and the organization of the district board of education, and provision shall be made by law for the exercise of this power by such school districts.

Plaintiffs claim that this provision subjects school boards to mandatory referenda and

that H.B. 269 unconstitutionally delays such referenda for at least five years.

Although Plaintiffs' argument has some limited appeal, the relevant Ohio case law grants the state legislature discretion as to the timing of the referenda so long as the legislature acts reasonably. In *State ex. rel. Ach v. Evans*, 90 Ohio St. 243, 107 N.E. 537, 538 (1914), the Ohio Supreme Court addressed the constitutionality of the Jung Small School Board Act ("Jung Act") under the same referendum provision at issue here. The Jung Act classified and organized city school districts and their respective school board members by using three general categories based on population. *Id.* at 537. The central legal challenge in *Evans* was that the Jung Act impermissibly infringed on the referendum provision of the Ohio Constitution. The relevant provision of the Jung Act provided:

Said commission shall prepare and submit to the electors at the next general school election, if one occur not less than one hundred and twenty days after the passage of said resolution, otherwise, at the second general school election, two or more plans for the organization of the board of education in such district....

*Id.* at 538. The 120 day limitation period, coupled with the enactment date of the Jung Act, delayed the earliest public referendum for more than two years after the implementation of the new classification scheme and allegedly rendered the Jung Act unconstitutional.

9. Plaintiffs contend that the district court considered evidence outside of the pleadings and treated Defendants' Motion for Judgment on the Pleadings as one for summary judgment. Under Fed.R.Civ.P. 12(c), if "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment ... and all parties shall be given reasonable opportunity to present all material made pertinent to such [summary judgment] motion." Plaintiffs argue that the district court erred by not allowing further discovery before making its ruling. We disagree, however, because the district court made determinations of law on all of the issues based on the pleadings filed in the case. Courts may permissively consider factors outside the pleadings when deciding whether a statute bears a rational relationship to a legitimate state purpose. *See Heller v. Doe*, 509 U.S. 312, 319–21, 113 S.Ct. 2637, 2642–43, 125 L.Ed.2d 257 (1993) (state statutes subject to rational basis review are presumed valid and should be upheld if there is "any reasonably conceivable state of facts that could provide a rational basis for the classification"). Consequently, we dismiss Plaintiffs' argument that additional discovery is warranted.

The Ohio Supreme Court, however, found the Jung Act constitutional under the state constitution and held that the referendum provision did not require that voters approve any legislative change to the organization of the boards of education in Ohio cities before the legislature can enact and implement such changes. *Id.* Instead, *Evans* held that the legislature may make such changes without voter pre-approval so long as it provides the voters with an opportunity at a later date to vote on the changes. *Id.* ("It is obvious that this provision of the Constitution does not require that, before any change shall be made in the old board, a referendum shall be provided determining what change shall be made."); *see also State ex rel. Core v. Green,* 160 Ohio St. 175, 115 N.E.2d 157, 160 (1953) (holding that the legislature may change the organization and control of the public schools without holding an immediate public referendum). Absent a showing of bad faith on the part of the legislature, the court determined that the Jung Bill did not conflict with the referendum provision of the Ohio Constitution because the Jung Bill provided for a referendum within a reasonable time. *See Evans,* 107 N.E. at 538 ("Statutes cannot be held unconstitutional upon the ground that somebody disagrees with the Legislature as to the time at which an act should take effect. The Legislature is presumed to have acted in good faith, and there is nothing in the record to overcome that presumption."). *Evans* thus implied that the legislature could wait two years before submitting the school district changes to a referendum. *See id.*

We read *Evans* as supporting Defendants' position. Despite Plaintiffs' argument that *Evans* established a two-year waiting period for a referendum as the maximum reasonable time period permissible, *Evans* never imposed or implied an exact limitation on the legislature with respect to the timing of referenda. Further, the four year period in H.B. 269 is reasonably related to the legitimate state purpose of improving the school board and providing the new appointees with some leeway to do their work. Without further guidance from the Ohio Supreme Court, we find *Evans* controlling and hold that H.B. 269 does not violate the referendum proviso of the Ohio Constitution.

As additional support for our holding, we note that the Ohio Legislature enacted on the same day both Article VI, Section 3 (the referendum provision) and Article XVIII, Section 5, which also contains a referendum provision that involves public utilities.[10] Unlike the constitutional provision at issue in this case, the utility referendum provision provides for voter approval before a challenged ordinance takes effect. Had the drafters of the Ohio Constitution wanted a similar express limitation in Article VI, Section 3, it is likely they would have included similar language in that provision. The fact that they did not evinces their intent that discretion regarding the timing of referenda under Article VI, Section 3 should rest with the legislature, which has determined that four years between referenda is acceptable. We do not believe *Evans* implies a contrary result. Moreover, despite Plaintiffs attempts to portray municipal school districts as special because they involve a four-year period before a referendum, Ohio statutes limit referenda to four years

---

10. The particular constitutional provision states:

> Any municipality proceeding to acquire, construct, own, lease or operate a public utility, or to contract with any person or company therefor, shall act by ordinance and no such ordinance shall take effect until after thirty days from its passage. If within said thirty days a petition signed by ten per centum of the electors of the munic-

> ipality shall be filed with the executive authority thereof demanding a referendum on such ordinance it shall not take effect until submitted to the electors and approved by a majority of those voting thereon. The submission of any such question shall be governed by all the provisions of section 8 of this article as to the submission of the question of choosing a charter commission.

Ohio Const. Art. XVIII, § 5.

for both city and municipal school districts. O.R.C. § 3313.04. Thus, Ohio legislators had a reasonable basis for choosing the four-year period as a reasonable time period for testing the new appointive school board system and we affirm the judgment of the district court on this issue.

### C. Equal Protection

■■■ Under the Equal Protection Clause of both the United States and Ohio Constitutions, courts apply strict scrutiny when the legislative classification at issue involves a fundamental right or a suspect class.[11] Although the right to vote, per se, is not a "constitutionally protected right," the Supreme Court has found, "implicit in our constitutional system, [a right] to participate in state elections on an equal basis with other qualified voters whenever the State has adopted an elective process for determining who will represent any segment of the State's population." *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 35 n. 78, 93 S.Ct. 1278, 1298 n. 78, 36 L.Ed.2d 16 (1973); *see also Dunn v. Blumstein*, 405 U.S. 330, 336, 92 S.Ct. 995, 1000, 31 L.Ed.2d 274 (1972) ("[T]his Court has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."); *Desenco, Inc.*, 706 N.E.2d at 332 (the right to vote is a fundamental right).

■■■ If the challenged legislation grants the right to vote to some residents while denying the vote to others, then we must subject the legislation to strict scrutiny and determine whether the exclusions are necessary to promote a compelling state interest. *Dunn*, 405 U.S. at 337, 92 S.Ct. at 1000. If the legislation, however, does not infringe on the right to vote, we examine the challenged statute under the rational basis standard. Under this lower standard, it may be permissible for a state to treat classes of persons differently if the legislation rationally relates to legitimate state purposes. *Rodriguez*, 411 U.S. at 40, 93 S.Ct. at 1300; *see also Heller*, 509 U.S. at 319, 113 S.Ct. at 2642–43, (state statutes subject to rational basis review carry a strong presumption of validity). When determining which standard applies in cases that address educational policy, "[t]he very complexity of the problems of financing and managing a statewide public school system suggests that 'there will be more than one constitutionally permissible method of solving them,' and that, within the limits of rationality, 'the legislature's efforts to tackle the problems should be entitled to respect.'" *Rodriguez*, 411 U.S. at 42, 93 S.Ct. at 1301–02 (citing *Jefferson v. Hackney*, 406 U.S. 535, 546–47, 92 S.Ct. 1724, 1731, 32 L.Ed.2d 285 (1972)). Moreover, the Supreme Court previously endorsed appointive systems for nonlegislative offices and implied that voters do not have a fundamental right to an elected school board. *See Sailors v. Bd. of Educ.*, 387 U.S. 105, 108, 87 S.Ct. 1549, 1552, 18 L.Ed.2d 650 (1967) ("We find no constitutional reason why state or local officers of the nonlegislative character involved here may not be chosen by the governor, by the legislature, or by some other appointive means rather than by an election."). Against this backdrop, we turn to Plaintiffs' equal protection challenges.

### 1. Municipal School Districts v. City School Districts

■■■ Plaintiffs first argue that H.B. 269 unconstitutionally differentiates between those residents who reside in municipal school districts and those who do not by implementing an appointive system for school boards in municipal school districts while other school districts may elect their school boards. Plaintiffs also challenge

---

**11.** The Ohio Supreme Court has stated that the "Equal Protection Clause of the United States Constitution, contained in the Fourteenth Amendment, and the Equal Protection Clause of the Ohio Constitution, contained in Section 2, Article I, are functionally equivalent." *Desenco, Inc. v. City of Akron*, 84 Ohio St.3d 535, 706 N.E.2d 323, 332 (1999). We thus interpret the two together.

the elimination of licensing, educational and experiential requirements within municipal school districts as a violation of equal protection because all school districts in Ohio other than municipal school districts must abide by these requirements. These violations, Plaintiffs argue, infringe on their right to vote and require us to apply strict scrutiny to H.B. 269, which would require the state to provide a compelling state interest for enacting H.B. 269.

 Plaintiffs, however, misconstrue the law. Although Plaintiffs have a fundamental right to vote in elections before them, there is no fundamental right to elect an administrative body such as a school board, even if other cities in the state may do so. *See Sailors*, 387 U.S. at 108, 87 S.Ct. at 1552; *Welch v. Bd. of Educ.*, 477 F.Supp. 959, 964 (D.Md.1979). Further, the licensing requirements at issue do not impinge on the right to vote and H.B. 269 does not infringe on a suspect class. Nor may we subject the statute to strict scrutiny solely because it relates to education or because H.B. 269 denies children access to education. *See Rodriguez*, 411 U.S. at 33–37, 93 S.Ct. at 1297–98 (education is not a fundamental right). We thus find rational basis review appropriate and, granting the state statute "a strong presumption of validity," we examine whether "there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Heller*, 509 U.S. at 319–20, 113 S.Ct. at 2642–43.

 As a means to prove that the statute rationally relates to a legitimate governmental purpose, we note the exhaustive study done by the Cleveland Summit on Education, which determined that the Cleveland School District faced financial and operational woes. The Summit appointed an advisory committee, which recommended an appointive system because the elected school board members were often inadequately qualified and there was a high turnover rate. The committee also noted that appointed school boards had proven successful in other large cities in the country. The Ohio Legislature took note of this study and accepted the recommendation of the advisory committee when enacting H.B. 269.

In *Irby v. Virginia State Bd. of Elections*, 889 F.2d 1352, 1355 (4th Cir.1989), the Fourth Circuit listed a number of reasons in favor of appointed school boards in upholding the state's decision to appoint school board members:

(i) insulating school governance matters from direct political pressures;

(ii) promoting stable school board membership;

(iii) encouraging the service of individuals who would not seek elective office;

(iv) promoting diversity in .viewpoints which otherwise may not achieve representation on an elected school board;

(v) avoiding the division of fiscal authority among multiple elected bodies;

(vi) avoiding the fragmentation of local political authority;

(vii) avoiding the problem of single issue campaigns which frequently occur with elected school boards.

*Irby*, 889 F.2d at 1355. Like the district court, we agree that appointed school boards may provide significant benefits in a State's attempt to improve local schools. State legislatures need the freedom to experiment with different techniques to advance public education and this need to experiment alone satisfies the rational basis test. *Sailors*, 387 U.S. at 110–11, 87 S.Ct. at 1553.

With respect to the licensing requirements, the district court determined that H.B. 269 "bears a rational relationship to the state's interest in regenerating a municipal school district and ultimately benefitting the children attending the schools in the district" because the school district "may benefit from a more flexible hiring plan." We agree. By having less restrictive hiring procedures, the school board

can hire diverse individuals who can add insight and experience to the school board and propose new solutions for resolving the current school crisis. Were we to limit a State's ability to determine licensing requirements, we would tie the hands of state legislators who must try innovative solutions for fixing public education. Given the Supreme Court's own deference to the States in this educational arena and Ohio's admirable goal of improving the quality of public schools, we hold that the statute rationally relates to a legitimate governmental purpose and Plaintiffs' equal protection arguments on these two bases must fail.

## 2. Extraterritoriality—One Person, One Vote

■ In their final equal protection challenge, Plaintiffs allege that H.B. 269 "unconstitutionally compounds the voting disenfranchisement for some residents in the Cleveland Public School District living in the Village of Bratehahl, Linndale, Newburgh Heights and part of Garfield Heights, because these residents do not vote in the Cleveland mayoral elections." According to Plaintiffs, non-Cleveland residents who reside in the same school district lose their elective opportunity to vote for the person who appoints individuals to their school board, thus depriving them of equal protection under the law. We disagree.

Although the parties do not explicitly say so, they essentially dispute whether H.B. 269 violates the "one-person, one-vote" doctrine under the Equal Protection Clause. In *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962), the Supreme Court held that courts could decide equal protection challenges to state congressional apportionment and paved the way for judicial review of state and municipal elections. In *Wesberry v. Sanders*, 376 U.S. 1, 18, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964), the Court further articulated the one-person, one-vote standard for evaluating these challenges to

congressional districts and elections. Over time, the Court subjected legislation that infringed on the one-person, one-vote rule to strict scrutiny and expanded the rule to include elections of state legislators, county officials, and even trustees of a community college. *See Reynolds v. Sims*, 377 U.S. 533, 568, 84 S.Ct. 1362, 1385, 12 L.Ed.2d 506 (1964) (elections of state legislators); *Avery v. Midland County, Tex.*, 390 U.S. 474, 484–85, 88 S.Ct. 1114, 1120–21, 20 L.Ed.2d 45 (1968) (county officials); *Hadley v. Junior College Dist. of Metro. Kansas City, Mo.*, 397 U.S. 50, 53–54, 90 S.Ct. 791, 793–94, 25 L.Ed.2d 45 (1970) (trustees of a community college district).

■ Residency is the key element in determining whether legislation violates the one-person, one-vote doctrine. *See Holt v. City of Tuscaloosa*, 439 U.S. 60, 68, 99 S.Ct. 383, 389, 58 L.Ed.2d 292 (1978). Some cases raise issues of voter inclusion, in which residents within a certain area are excluded from voting on particular matters. *See Kramer v. Union Free Sch. Dist.*, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); *Cipriano v. City of Houma*, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969); *City of Phoenix v. Kolodziejski*, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970). Other cases focus on voter dilution, such as the permissibility of allowing non-resident voters to vote in district elections and potentially "dilute" the voting power of the residents. *See Spahos v. Mayor of Savannah Beach*, 207 F.Supp. 688 (S.D.Ga.), *aff'd. per curiam*, 371 U.S. 206, 83 S.Ct. 304, 9 L.Ed.2d 269 (1962); *Bd. of County Comm'r of Shelby County, Tenn. v. Burson*, 121 F.3d 244, 247–48 (6th Cir.1997); *Duncan v. Coffee County*, 69 F.3d 88, 92 (6th Cir.1995). Still other cases, such as this one, address voter disenfranchisement when a municipality has some control over non-residents who cannot vote in municipal elections, *i.e.*, cases of extraterritorial jurisdiction. *See Holt*, 439 U.S. at 68, 99 S.Ct. at 389. Here, one Plaintiff is not a resident of the City of Cleveland and does not vote in the

City's mayoral elections even though the mayor appoints a school board that encompasses Plaintiff within its jurisdiction. Accordingly, this case raises issues of extraterritoriality in which the City of Cleveland extends its authority over those non-residents who do not participate in City of Cleveland elections.

In *Holt*, the Supreme Court held that residents of an unincorporated community did not have a constitutional right to participate in the political processes of the City of Tuscaloosa simply because the corporation's residents were subject to Tuscaloosa's police and sanitary regulations. *Holt*, 439 U.S. at 69–70, 99 S.Ct. at 389–90. In reaching this decision, the Court determined that "the fact that the state extended certain powers of city agencies beyond their borders did not require the city to grant the franchise to rural residents because they were not residing within the geographic entity known as the City of Tuscaloosa." *Duncan*, 69 F.3d at 93. *Holt* thus illustrates that non-residents do not necessarily have the right to vote in a city election simply because the city has some limited authority over the non-residents. *Holt*, 439 U.S. at 69, 99 S.Ct. at 389 (The "argument that extraterritorial extension of municipal powers requires concomitant extraterritorial extension of the franchise proves too much.").

As a counterpoint to *Holt*, Plaintiffs argue that language from the Supreme Court's decision in *Kramer v. Union School District*, controls the outcome. In *Kramer*, the Supreme Court struck down a statute that allowed local residents to vote for their school district only if they owned real property within the school district or were parents of children enrolled in the school district. Applying strict scrutiny, the Court found an equal protection violation and, for our purposes, provided some important dicta:

> Nor is the need for close judicial examination affected because the district meetings and the school board have "general" legislative powers. Our exacting examination is not necessitated by the subject of the election; rather, it is required because some resident citizens are permitted to participate and some are not. For example, a city charter might well provide that the elected city council appoint a mayor who would have broad administrative powers. Assuming the council were elected consistent with the commands of the Equal Protection Clause, the delegation of power to the mayor would not call for this Court's exacting review. *On the other hand, if the city charter made the office of mayor subject to an election in which only some resident citizens were entitled to vote, there would be presented a situation calling for our close review.*

*Kramer*, 395 U.S. at 629–30, 89 S.Ct. at 1891 (emphasis added). At first blush, the language in *Kramer* seemingly conflicts with *Holt*. On closer examination, however, the language in *Kramer* refers to "residents" within the school district who lack the right to vote. The lesson of *Holt* and *Kramer* is an important one: If residents of the relevant jurisdiction are excluded from participation, as in *Kramer*, then the court subjects the legislation to strict scrutiny. If, however, the legislation merely concerns extraterritorial jurisdiction over non-residents, courts employ rational basis review, granting the States wide latitude to create political subdivisions and exercise state legislative power. *Holt*, 439 U.S. at 71, 99 S.Ct. at 390.

As we mentioned above, extraterritorial voters in the outer Cleveland suburbs are not "residents" of the City of Cleveland and surely do not deserve the right to vote in Cleveland mayoral elections. Although Plaintiffs are residents of the municipal school district, no elections occur within that jurisdiction from which Plaintiffs are excluded. If the municipal school boards were elected bodies and only the Cleveland residents could vote in the school board election, then the relevant geopolitical entity would be the municipal school district, *Kramer* likely would apply, and problems

of voter inclusion would arise. This case, however, concerns an appointive system that appears more like the exercise of extraterritorial jurisdiction seen in *Holt* than the outright denial of the right to vote in *Kramer*. Even the above quoted language from *Kramer* states that a delegation of power to the mayor would require only rational basis review. We accordingly subject H.B. 269 to rational basis review.

■■■ Under this lesser standard, we defer to the Ohio Legislature's creation of the appropriate "jurisdiction" (municipal school districts), which, as in *Holt*, defined a political area in which some residents could vote in municipal elections and others could not. Based on the need to modify and improve the established school system that was failing the City of Cleveland and its schoolchildren, Ohio legislatively defined a municipal school district as a geopolitical entity with an appointive school system and granted the Mayor of Cleveland extraterritorial jurisdiction for the appointment of the school board. In light of *Holt*, we believe the State has the power to do so and has presented a rational basis for enacting the statute. Plaintiffs retain the right to vote in national and state elections and if they want to change the appointive system at issue here, both those within and those outside of the City of Cleveland may use their elective voice to challenge state legislators and the governor as a means to overturn H.B. 269. Indeed, state legislators obviously anticipated some of the polemical issues surrounding municipal school districts be-

cause they ensured at least one member of the school board would be from an area other than Cleveland, a guarantee that did not exist for non-Cleveland residents prior to the enactment of H.B. 269.

We believe H.B. 269 establishes a rational school system that relates to the legitimate state interest of improving public schools. We thus affirm the district court on this issue and find no equal protection violation under federal or state law.

## D. The Voting Rights Act

■■■ An individual may bring a private cause of action under Section 2 of the Voting Rights Act, 42 U.S.C. § 1973,[12] which provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the politi-

---

12. Plaintiffs Complaint alleges violations of the Voting Rights Act, 42 U.S.C. § 1971, which provides:

All citizens of the United States who are otherwise qualified by law to vote at any election by the people in any State, Territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision, shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law custom, usage, or regulation of any State or

Territory, or by or under its authority, to the contrary notwithstanding.
Section 1971, however, is not part of the enforcement provisions of the Voting Rights Act and only the Attorney General can bring a cause of action under this section. *See* 42 U.S.C. § 1971(c). Although Plaintiffs' Complaint does not specify which section of the Act applies, we analyze Plaintiffs' claims under the more substantive provisions of the Voting Rights Act, specifically §§ 1973 and 1973c, that permit citizen suits.

cal process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973. Although Plaintiffs must prove discriminatory intent to prevail in an Equal Protection Clause or Fifteenth Amendment claim, Section 2 of the Voting Rights Act requires only a showing of discriminatory effect. *See Thornburg v. Gingles*, 478 U.S. 30, 70–74, 106 S.Ct. 2752, 2776–78, 92 L.Ed.2d 25 (1986).

■ Nonetheless, all federal courts that have addressed this issue have determined that Section 2 only applies to elective, not appointive, systems. *See African–American Citizens for Change v. St. Louis Bd. of Police Comm'r*, 24 F.3d 1052, 1053 (8th Cir.1994); *Irby*, 889 F.2d at 1357 (implying, but not holding, that Section 2 does not apply to appointive offices); *Dillard v. Crenshaw County*, 831 F.2d 246, 251 (11th Cir.1987); *Searcy v. Williams*, 656 F.2d 1003, 1010 (5th Cir.1981), *aff'd, Hightower v. Searcy*, 455 U.S. 984, 102 S.Ct. 1605, 71 L.Ed.2d 844 (1982); *African–American Legal Defense Fund, Inc. v. New York*, 8 F.Supp.2d 330, 339 n. 14 (S.D.N.Y.1998); *African–American Voting Rights Legal Defense Fund, Inc. v. Missouri*, 994 F.Supp. 1105, 1122 (E.D.Mo. 1997), *aff'd. per curiam*, 133 F.3d 921 (8th Cir.1998); *Prewitt v. Moore*, 840 F.Supp. 436, 440 (N.D.Miss.1993); *Williams v. State Bd. of Elections*, 696 F.Supp. 1563, 1568–69 (N.D.Ill.1988).

These cases draw support primarily from some important dicta in *Chisom v.*

*Roemer*, 501 U.S. 380, 404, 111 S.Ct. 2354, 2368–69, 115 L.Ed.2d 348 (1991), a case in which the Supreme Court held that state judicial elections fell under the Voting Rights Act. In a noteworthy paragraph, the Court pointed out that "Louisiana could, of course, exclude its judiciary from the coverage of the Voting Rights Act by changing to a system in which judges are appointed, and, in that way, it could enable its judges to be indifferent to popular opinion." *Id.* at 401, 111 S.Ct. at 2367. Although dicta, all courts that have addressed Section 2 in the context of an appointive system have interpreted this language in *Chisom* to mean that appointive offices do not fall within the ambit of the Voting Rights Act. *See African–American Citizens for Change*, 24 F.3d at 1053–54; *Irby*, 889 F.2d at 1357–58.

We agree with our sister circuits and all of the district courts that have addressed the issue. The plain language of Section 2 refers to the nomination of "representatives," whom the Supreme Court has defined as "winners of representative, popular elections" or "someone who has prevailed in a popular election." *Chisom*, 501 U.S. at 399–400, 111 S.Ct. at 2366. We fail to see how appointed school board members fall under this definition.

■ Further, by its own terms, the Act covers only the *election and nomination* of representatives, not appointment processes, which Congress left open to attack under Section 5 of the Voting Rights Act. *See* 42 U.S.C. § 1973(c). Section 5 requires certain jurisdictions in the United States that have records of voting discrimination to obtain "preclearance" of proposed changes in election procedures that could affect voting rights.[13] Despite some

---

13. A shift from an elective system to an appointive one is subject to Section 5. *See Presley v. Etowah County Comm'n*, 502 U.S. 491, 503, 112 S.Ct. 820, 828, 117 L.Ed.2d 51 (1992) (stating that " § 5 applies to changes ... affecting the creation or abolition of an elective office."); *McCain v. Lybrand*, 465

U.S. 236, 250–51, 104 S.Ct. 1037, 1046–47, 79 L.Ed.2d 271 (1984) (change from appointed to elected officials falls under § 5); *Allen v. State Bd. of Elections*, 393 U.S. 544, 569–70, 89 S.Ct. 817, 834, 22 L.Ed.2d 1 (1969) (change from elective to appointive office falls under § 5). Plaintiffs cannot allege a viola-

cursory language in the legislative history, there is no strong evidence that Congress intended for Section 2 to provide a basis for challenging appointive systems. *See* S. Rep. 97–417, at 6 (1982), *reprinted in* 1982 U.S.C.C. A.N. 177, 183 (discussing, among other things, shifts from elective to appointive office.). If this were true, Plaintiffs could challenge "a state's choice between an elective and an appointive system for filling a given office, even when that choice was made years before enactment of the Voting Rights Act." *Irby*, 889 F.2d at 1358. Like many other courts to address this issue, we believe such an interpretation reaches too far. The fact that Section 5 is limited to certain jurisdictions implies that Congress intended to allow other jurisdictions to change from an elective to an appointive system without facing challenges under the Voting Rights Act. In the absence of contrary congressional intent, we find these reasons sufficient to exclude cases like this one from the purview of the Voting Rights Act. Finally, we note that the Supreme Court affirmed, without comment, the *Searcy* decision, in which the Fifth Circuit determined that the Voting Rights Act did not apply to an appointive school board.[14] *Searcy*, 656 F.2d at 1009, *aff'd, Hightower v. Searcy*, 455 U.S. 984, 102 S.Ct. 1605, 71 L.Ed.2d 844 (1982).

For the reasons stated, we affirm the district court on this issue and hold that Section 2 of the Voting Rights Act does not apply to appointive offices.

### E. The Uniformity Clause

▇▇▇▇▇ Turning again to state law issues, Plaintiffs assert that H.B. 269 violates the Uniformity Clause, Article II, Section 26, of the Ohio Constitution, which ensures that all laws within Ohio are applied uniformly:

> All laws, of a general nature, shall have a uniform operation throughout the State; nor, shall any act, except such as relates to public schools, be passed, to take effect upon the approval of any other authority than the General Assembly, except, as otherwise provided in this constitution.

In reviewing legislation under the Uniformity Clause, Ohio courts use a two-part test: (1) whether the subject matter at issue is one of general or special nature, and, if one of general nature, (2) whether the legislation operates uniformly throughout Ohio. *See Desenco, Inc.*, 706 N.E.2d at 330. Both parties agree that the subject matter of H.B. 269, public schools, is one of general nature. *See Simmons–Harris v. Goff*, 86 Ohio St.3d 1, 711 N.E.2d 203, 213 (1999) ("[S]chools are a subject of general nature."). Because H.B. 269 thus invokes the Uniformity Clause, we must determine whether the statute applies uniformly throughout the State.

In *State ex rel. Zupancic v. Limbach*, 58 Ohio St.3d 130, 568 N.E.2d 1206, 1213 (1991), the Ohio Supreme Court stated that the Uniformity Clause applies to those localities or entities that meet a specified set of common characteristics, so long as the law is applied to those localities or entities uniformly. *See also Desenco*, 706 N.E.2d at 331. Although many school

---

tion of Section 5 on this appeal since that section applies only to those jurisdictions with a history of voting discrimination. Ohio does not fall within this category and thus is not subject to Section 5. *See* 28 C.F.R. § 51.4.

**14.** At issue in *Searcy* was a system in which every year one board member would retire and that retiring member, with the remaining board members, would elect a new board member. 656 F.2d at 1005. The Fifth Circuit determined that although legislation provided for an "election" of new school board

members, "a system by which a small number of elected or appointed persons select a school board (or fill its vacancies) is basically an appointive system. Appointed school board systems are permissible under the Constitution so long as the appointments are not made in a manner that systematically excludes an element of the population from consideration." *Id.* at 1009. The court then held that Voting Rights Act was inapplicable because the case concerned an appointive system for the school board. *Id.* at 1010.

districts in Ohio may never qualify as a municipal school district, H.B. 269 need not apply to all school districts in Ohio, but rather must apply uniformly to those that fall within its limits. *See Goff*, 711 N.E.2d at 213; *State ex rel. Stanton v. Powell*, 109 Ohio St. 383, 142 N.E. 401, 401–02 (1924) (holding that a statute that applies only to those counties having two or more common pleas judges does not violate the uniformity clause, even though "[t]he fact that the majority of the counties of the state have only one common pleas judge [and] therefore nothing upon which the act can operate.").

Moreover, it is immaterial that Cleveland is the only school district that currently falls within the provisions of H.B. 269 "so long as it . . . may apply to cases similarly situated in the future.[15] *See Goff*, 711 N.E.2d at 213 (citing *Limbach*, 568 N.E.2d at 1213). Simply because the Ohio Legislature drafted H.B. 269 with Cleveland as its target does not suggest that the legislation will not apply uniformly to other school districts that fall under a federal court order and thus fit within the definition of a municipal school district. As with the similar school voucher statute at issue in *Goff*, the Ohio Legislature had a rational basis for enacting the school board legislation here and "for specifically targeting the Cleveland City School District, which is the largest in the state and arguably the one most in need of state assistance." *Goff*, 711 N.E.2d at 214. We conclude that the Ohio General Assembly "did not arbitrarily or unnecessarily restrict the operative provisions" of the statute from applying to other similarly situated school boards throughout the state. *See id.* ("That other school districts also have significant problems does not mean the distinction between school districts under state supervision by order of a federal

court and other school districts is not real."). Accordingly, we hold that H.B. 269 operates uniformly throughout Ohio.

### F. Conflict of Interest

Finally, Plaintiffs argue that H.B. 269 creates an inherent conflict of interest under Ohio common law by having the same individual act as both Mayor of the City of Cleveland and the person responsible for appointing individuals to the school board. Most Ohio conflict of interest cases involve situations in which one individual holds two separate public positions, *i.e.*, one individual serving two distinct entities, rather than one individual merely assuming new duties at the behest of the state legislature. These Ohio cases generally find no inherent incompatibility among public offices. *See Rose v. Village of Wellsville*, 63 Ohio Misc.2d 9, 613 N.E.2d 262, 267–70 (Ohio Ct.Comm.Pl.1993) (village legal counsel and assistant county prosecuting attorney are compatible positions); *Esler v. Summit County*, 39 Ohio Misc.2d 8, 530 N.E.2d 973, 975 (Ohio Ct. Comm.Pl.1985) (positions of township trustee and county chief building inspector were compatible); *Pistole v. Wiltshire*, 189 N.E.2d 654, 658–60 (Ohio Ct.Comm.Pl. 1961) (positions of deputy sheriff and township trustee were compatible). *But see Chronister v. Trumbull County Prosecuting Attorney*, 39 Ohio Misc.2d 10, 531 N.E.2d 785, 786 (Ohio Ct.Comm.Pl.1988) (positions as township clerk and deputy county auditor are incompatible because clerk is subordinate to auditor). In a somewhat similar case, the Ohio Attorney General decided that an individual may serve as village mayor and a member of the board of education of an exempted village school district so long as the individual abstains from certain votes. *See* Ohio Att. Op. 98–017 (June 15, 1998).

**15.** Plaintiffs contend that the district court did not accept their pleadings as true or make a determination based solely on the pleadings. No court, however, must accept incorrect legal conclusions. Simply because Plaintiffs are factually accurate in stating that the legislation does not currently apply to any other school district does not preclude the district court from making the legal determination that the legislation is permissible because the statute may apply uniformly in the future.

In the instant case, the Mayor merely assumes additional executive responsibilities and does not directly control the school board, let alone serve on the school board or act in any legislative capacity. Rather than create a situation in which one individual serves in two public capacities, H.B. 269 merely expands the executive power of the local executive. Further, the Mayor only has minimal control as to those individuals appointed to the school board because he or she may select members only from a panel of candidates comprised of various individuals from the community. Although the Mayor retains some limited authority in that he or she may remove the CEO of the Cleveland School Board, even this singular power is limited to the first thirty months of the school board's existence, after which the Mayor must obtain the approval of the school board to fill that position. O.R.C. § 3311.72(B). Considering these substantial limitations on this new "role" for the Mayor, we hold H.B. 269 does not create a conflict of interest for the Mayor of Cleveland under Ohio law.

Even if we were to determine that this issue presented a question of fact, we still would not reach a contrary result. By enacting H.B. 269 and granting the mayor new and added responsibilities, the Ohio Legislature overrode any common law implications that a conflict exists. *See In re Miller*, 63 Ohio St.3d 99, 585 N.E.2d 396, 404–05 (1992) (statutes may be in derogation of common law, but must be strictly construed). If a conflict existed under previous statutes, then the legislature's most recent enactment controls our decision and would authorize the Mayor of Cleveland to appoint the municipal school board. *See* O.R.C. § 1.52(A) (latest statutory enactment prevails).

For these various reasons, we affirm the district court on this issue.

## IV. CONCLUSION

After a detailed review of Plaintiffs' allegations, we believe Chief Judge White thoroughly and correctly analyzed all of the issues and we agree with his holdings on the merits. With respect to the state law and federal Equal Protection claims against the State of Ohio, we **DISMISS** those claims pursuant to the Eleventh Amendment. In all other respects, we **AFFIRM** the judgment of the district court.