Irwin E. HAWKINS, Teresa M. Wondercheck, Zane L. Wondercheck, Jerry R. Nicholls, Thomas P. Kappas, and Paul J. Simmons, Plaintiffs,

v.

Michael JOHANNS, in his official capacity as Governor of the State of Nebraska, Donald B. Stenberg, in his official capacity as Attorney General of the State of Nebraska, and Douglas D. Christensen, in his official capacity as Commissioner of Education for the State of Nebraska, Defendants,

and

Greater Nebraska Schools Association, Amicus Curiae.

No. 4:98CV3246.

United States District Court, D. Nebraska.

March 31, 2000.

---

**2.** Following *Cass County* there was a split in the circuits as to whether 17 U.S.C. § 504(c)(2) granted a jury trial right. The Supreme Court in *Feltner v. Columbia Pictures Television, Inc.,* 523 U.S. 340, 118 S.Ct. 1279, 140 L.Ed.2d 438 (1998), resolved the split and held that the Seventh Amendment provided a jury trial right when statutory damages were sought in copyright infringement actions.

John F. Recknor, Recknor & Associates, Lincoln, NE, for Plaintiffs.

Charlotte R. Koranda, Attorney General's Office, Lincoln, NE, for Defendants.

James B. Gessford, Jeanette L. Stull, Perry, Guthery Law Firm, Lincoln, NE, for Amicus Curiae.

## MEMORANDUM AND ORDER

KOPF, District Judge.

Are Nebraska voters, who reside in elementary-only school districts, denied equal protection of the laws because their school districts have less power than school districts that educate high school students or students from kindergarten through high school (K–12)? Similarly, are Nebraska voters, who reside in elementary-only school districts, denied equal protection of the laws because their school districts are controlled for some purposes by other school districts that educate high school students or K–12 students? Applying a "rational basis" level of scrutiny, I find no violation of the Equal Protection Clause of the Fourteenth Amendment to the Constitution. Pursuant to Rule 52 of the Feder-

al Rules of Civil Procedure, the reasons for my decision are set forth below.

## I.  BACKGROUND

This complex case was tried on stipulated facts.  (Ex. PL–1.)  In addition to the stipulated facts, exhibits, including thousands of pages of legislative history, were also received in evidence.

### A.  The Context

Like many other states, Nebraska has struggled with how to pay the education costs for public school students.  Historically dependent upon local property taxes to fund the "common schools," but concerned with high taxes, tax equalization, education equity and local control, the Nebraska legislature began to overhaul its educational system.  In particular, Nebraska redesigned its taxing structure for education hoping to lower, or at least control, local property taxes.  As a result, State aid to local education increased.

This case challenges certain Nebraska laws that were enacted in 1996 and thereafter.  The suit seeks injunctive and declaratory relief only.  The six plaintiffs are voters in elementary-only school districts.  The defendants are the Nebraska governor, the attorney general, and the commissioner of education.

The plaintiffs claim that they are denied equal protection of the laws.  They have conceded that their challenge to the Nebraska statutes is a facial, and not an applied challenge.  (Transcript of trial (hereinafter "Trial Tr.") at 23.)

The plaintiffs allege that they are treated differently because their school districts lack the same powers as other school districts.  Specifically, they claim that their Class I school districts, and hence the voters in those districts, are controlled by other school districts, and thus other voters, in violation of the Equal Protection Clause.  The plaintiffs claim that these differences in treatment are not rational and are therefore discriminatory, although they do not claim that the discrimination is founded upon an invidious premise such as race or religion.  The plaintiffs also claim that because these differences in treatment impact their voting rights, I must employ strict scrutiny when evaluating their suit.

Specifically, the plaintiffs complain about four areas of dissimilarity.  (Transcript of telephone conference, February 17, 2000 (hereinafter Tr. 2) at 6–7.)  Those areas are:  (1) the relative inability to set their own school budgets and the relative inability to exceed the general fund budget authority once it is established;  (2) the relative inability to set or exceed tax levies;  (3) the relative inability to authorize and spend special building fund monies;  (4) the relative inability to merge, dissolve or reorganize.

### B.  Boards of Education and Classification of School Districts

In Nebraska, all public schools are within "a school district."  A "school district" is "the territory under the jurisdiction of a single school board, which is the governing body of the school district."  (Ex. PL–1 (Stipulation of Facts) at ¶ 1.)  *See* Neb.Rev. Stat. Ann. § 79–101(1) (Lexis 1999 Supp.) (defining "school district").  With certain exceptions, among those being the exceptions challenged here, all school boards have "the same general duties and responsibilities."  (Ex. PL–1 at ¶ 8.)

Nebraska school districts are classified by whether they educate elementary-age children only (Class I), children in grades K–12 (Classes II–V), high school students only or high school students plus students in grades 7 through 8 (Class VI).  Neb. Rev.Stat. Ann. § 79–102 (Lexis 1999 Supp.).  The primary difference between Class II through V school districts is the number of inhabitants within the school district.  *Id.*

Class I school districts are typically located in rural areas.  Some regions served by Class I school districts are very remote.  Other Class I districts are near larger towns or cities.  There are over 300 Class I districts.  (Ex. 26 at 5038.)  About 150 of

those districts educate ten or fewer students. (*Id.*)

### C. The Status of the Plaintiffs

Despite the association between districts, the plaintiffs are *not* residents of the districts that allegedly have de facto control over their Class I districts. That is, the plaintiffs are non-residents of the districts allegedly favored by the challenged statutes.

For each plaintiff, the following shows his or her Class I district; the "primary high school [district]"[1] for the plaintiff's Class I district (followed by a notation as to that district's classification, *e.g.*, II or III); the district(s) that the plaintiff's Class I district is "affiliated" with or a "part of"(followed by a notation as to that district's classification, *e.g.*, II or III); and where the plaintiff lives in relation to the other district(s) with which his or her Class I district is associated (bold print indicating the district with which the plaintiff is associated):

| Plaintiffs | Class I School District | Primary High School District | Residence and Associated Districts |
|---|---|---|---|
| **Irwin E. Hawkins** | Mason City | Litchfield (II) | (1) **Ansley** (III)—Hawkins lives in portion of Mason City "affiliated" with Ansley. |
| (Ex. PL–1 at ¶ 12) | | | Ansley System includes part of Mason City, plus 3 other Class I school districts. |
| | | | (2) Litchfield (II)—Litchfield System includes part of Mason City, plus 1 other Class I school district. |
| **Teresa M. and Zane L. Wondercheck** | Shell Creek | Albion (III) | (1) Albion (III)—Albion System includes portion of Shell Creek, plus portions of 5 other Class I school districts. |
| (Ex. PL–1 at ¶ 13) | | | (2) Petersburg (II)—Petersburg System includes portion of Shel l Creek, plus a portion of 1 other Class I school district. |
| | | | (3) **Newman Grove** (III)—Wondercheck lives in portion of Shell Creek "affiliated" with Newman Grove. Newman Grove System includes part of Shell Creek, plus portions of 4 other Class I school districts. |
| **Jerry R. Nicholls** | Oak Valley | Malcolm (III) | **Malcolm** (III)—Nicholls lives in Oak Valley, all of which is "affiliated" with Malcolm. |
| (Ex. PL–1 at ¶ 14) | | | |

1. Terms like this one are *defined later in this* opinion.

| Plaintiffs | Class I School District | Primary High School District | Residence and Associated Districts |
|---|---|---|---|
| | | | Malcolm System includes all of Oak Valley, and no other Class I school districts. |
| Thomas P. Kappas | Stull | Plattsmouth (III) | Plattsmouth (III)—Kappas lives in Stull, all of which is "affiliated" with Plattsmouth. |
| (Ex. PL–1 at ¶ 15) | | | Plattsmouth System includes all of Stull, and no other Class I school districts. |
| Paul J. Simmons | Golden Rule | Rushville (VI) | (1) **Gordon** (VI)—Simmons lives in portion of Golden Rule which is "a part of" Gordon. |
| (Ex. PL–1 at ¶ 16) | | | Gordon System includes portion of Golden Rule, plus portions of 13 other Class I school districts. |
| | | | (2) Rushville (VI)—Rushville System includes portion of Golden Rule, which "is a part of" Rushville, plus portions of 13 other Class I school districts. |

## D. The Definition of "Voter"

For all classes of school districts, a "legal voter" must generally possess three qualifications. Neb.Rev.Stat. Ann. § 79–101(3) (Lexis 1999 Supp.). In order to vote in a particular school district, these rules apply: (1) the voter must be registered to vote; (2) the voter must be domiciled in a precinct or ward in which he or she is registered to vote; (3) the precinct or ward in which he or she is registered must, in whole or in part, be within the boundaries of the school district for which the voter intends to vote.[2] *Id.*

## E. Class I Districts Must Associate With Other Districts

Although Nebraska law allows "free standing" elementary-only school districts (Class I districts), every elementary-only district, and the taxable property located

therein, must also be "in school systems" which offer education from K–12. Neb.Rev. Stat. Ann. § 79–402(1) (Lexis 1997). Note that the phrase "in school systems" does not mean that an elementary-only school district must be "in" the geographic confines of a K–12 or high school district. A Class I district can be "affiliated" with a Class II–V district or it can become a "part of" a Class VI district. *See* Neb. Rev.Stat. Ann. § 79–4,100 (Lexis 1997) (defining terms).

In requiring an association between elementary-only districts and other districts, it was the expressed intent of the Nebraska legislature to "reorganize" Class I districts. *Id.* § 79–402(2). The Nebraska legislature believed that such "reorganization" would contribute "to the objectives of tax equity, educational effectiveness,

---

**2.** There is one exception to this residence requirement and that is explained later regarding petitions and elections to exceed levy limitations.

and cost efficiency." Neb.Rev.Stat. Ann. § 79–401 (Lexis 1997). *See also* Neb.Rev. Stat. Ann. § 79–401 (Lexis 1999 Supp.) (operative July 1, 2000).

In short, a Class I school district must be associated with a school system that offers a high school education. As we shall see, the nature of the association ("affiliated with" or "part of") differs according to whether the Class I district associates with a K–12 district (Class II–V) or a high school district (Class VI).

### F. The Method of Association

The evidence does not disclose when or precisely how the various Class I districts in which the plaintiffs reside became associated with the other districts. We know that the law provides two ways for a Class I district to associate with a Class II–VI district. Neb.Rev.Stat. Ann. § 79–424 (Lexis 1999 Supp.) (procedures applicable).[3] The two ways are these: (1) a petition signed by sixty percent of the voters impacted by the decision can authorize the association, Neb.Rev.Stat.Ann. § 79–413(1) (Lexis 1999 Supp.) (providing for petition process) or (2) a ballot measure approved by a majority of the voters impacted by the decision can authorize the association, Neb.Rev.Stat. Ann. § 79–447 (Lexis 1999 Supp.) (providing for special election). In either case, and at least at the time of the petition or election, the voters of each Class I district had the opportunity to participate in the electoral process that made the association decision.

The document that creates the association must set out its "terms." Neb.Rev. Stat. Ann. § 79–427 (Lexis 1999 Supp.) (stating required contents of petition or plan). Although not entirely clear, it appears that the document authorizing the initial association may also provide where the Class I district lands and voters will be associated if the Class I district later dissolves. Neb.Rev.Stat. Ann. § 79–431(1)(b) (Lexis 1999 Supp.) (providing for association where the Class I district dissolves

"unless otherwise prescribed in the affiliation petition").

It thus appears that a Class I district, at least at the time of the initial association, has the right to retain certain powers for itself and conceivably for its voters. Whether the Class I districts in which the plaintiffs reside retained any powers, or, if powers were retained, what they are, is not revealed by the evidence.

Therefore, the description of the powers of a Class I district (or its voters) in the following portions of this opinion is based upon the assumption that no powers were retained at the time of the initial association. In other words, it is possible that the plaintiffs' Class I districts may have retained powers that ameliorate the impact of the challenged statutes. The evidence is silent on this point, and I have assumed the "worst" from the perspective of the plaintiffs.

### G. Class I District (Voters) "Affiliated" with Class II–V (K–12) Districts

Five of the plaintiffs (Mr. Hawkins, Ms. Wondercheck, Mr. Wondercheck, Mr. Nicholls, and Mr. Kappas) reside in Class I districts that are "affiliated" with a K–12 district (Class II–V). (Ex. PL–1 ¶¶ 12–15.) The parties have stipulated that:

> Affiliation or affiliation of school districts means an ongoing association of a Class I district or portion thereof not a part of Class VI district with one or more existing Class II, III, IV, or V districts for the purpose of (a) providing a high school program serving the Class I district students and (b) maintaining tax support to finance such program. The services provided may include student transportation . . . .

(Ex. PL–1 ¶ 10.) *See* Neb.Rev.Stat. Ann. § 79–4,100(2) (Lexis 1997) (defining terms in a similar manner).

§§ 79–413(1), 79–424, 79–427, 79–431(1)(b), and 79–447 (Lexis 1999 Supp.).

---

**3.** The predecessors to the statutes discussed in this section appear to have been similar. *See* historical notes to Neb.Rev.Stat. Ann.

The lawyers for both sides agree that when a Class I district "affiliates" with a Class II–V district, the voters in the Class I district are not entitled to vote for the school board that runs the K–12 (Class II–V) district. (Trial Tr. at 13, 22, 33, 41–42.) This separation of voting power results because the "affiliation" does not change the boundaries of the Class I or K–12 districts; that is, even though "affiliated" the districts (and their voters) remain geographically distinct. *Compare* Neb.Rev. Stat. Ann. § 79–101(3) (Lexis 1999 Supp.) ("Legal voter means a registered voter ... who is domiciled in a precinct or ward in which he or she is registered and which precinct or ward lies in whole or in part within the boundaries of a school district for which the registered voter chooses to exercise his or her right to vote ....") *with* Neb.Rev.Stat. Ann. § 79–4,100(2) (Lexis 1997) (defining "[a]ffiliation or affiliation of school districts" to mean "an ongoing association of a Class I district ... with one or more existing Class II, III, IV, or V districts" for the purpose of providing high school education for Class I students and maintaining tax support to finance such programs).

The reverse is also true. A voter in a K–12 district "affiliated" with a Class I school district would not be a "legal voter" for purposes of the Class I district. Such a voter could not vote for the school board that runs the Class I school district.

## H. Class I Districts (Voters) that are "part of" Class VI (7–12) Districts

Unless a Class I district "affiliates with" a Class II–V (K–12) district, that Class I district becomes "a part of the Class VI district" when it associates with the Class VI district. Neb.Rev.Stat. Ann. § 79–4,100(3) (Lexis 1997) (defining terms). One of the plaintiffs (Mr. Simmons) resides in a Class I district that is associated with two Class VI districts. (Ex. PL–1 ¶ 16.) In this situation, the lawyers for both sides agree that voters residing in the Class I district may vote for the Class I school board members and may vote for

the Class VI school board members as well, provided the Class I voter is a resident of that particular Class VI district. (Trial Tr. at 7, 21–22, 33.) *See* Neb.Rev. Stat. Ann. § 79–101(3) (Lexis 1999 Supp.); Neb.Rev.Stat. Ann. § 32–546 (Lexis 1995); Neb.Rev.Stat. Ann. § 79–553 (Lexis 1997).

## I. Portions of a Class I District Associated with Two or More Other Districts

To make matters more complex, a Class I district may associate with more than one Class II–VI district. For example, a portion of Mr. Hawkins' Class I district (Mason City) is "affiliated with" a Class III district (Ansley) and another portion of the Class I district is "affiliated with" a Class II district (Litchfield). (Ex. PL–1 ¶ 12.) Hawkins resides on land that is "affiliated with" the Ansley district. *Id.* Hawkins cannot vote in either the Litchfield district or the Ansley district because even though he is "affiliated with" one of the districts his residence is outside both districts.

A similar, but not identical situation, exists for Class I and Class VI districts. A portion of Mr. Simmons' Class I district (Golden Rule) is "a part of" one Class VI district (Gordon). His Class I district is also a "part of" another Class VI district (Rushville). Simmons lives on land that is "a part of" of the Gordon district. Because Simmons' residence is "a part of" the Gordon district, he may vote in that district. Neb.Rev.Stat. Ann. § 79–101(3) (Lexis 1999 Supp.). He may not, however, vote in the Rushville district since he does not live there. *Id.*

## J. General Fund Budget Authority

Neb.Rev.Stat. Ann. § 77–3342(2)(a) (Lexis 1999 Supp.) establishes levy limits for "school districts and multiple-district school systems" of "one dollar and ten cents per one hundred" until fiscal year 2001–02. *Id.* Among other things, this means that Class I districts that are "affiliated with" or "part of" other school districts must share their budget authority

with associated school districts that educate students through the high school grades. *Id.*

The manner in which the budget limitations are calculated "differs for those districts which offer high school education (Class II–VI districts) and those which offer elementary education only (Class I districts)." (Ex. PL–2 at 2 (a pamphlet entitled "A Budgeting Text For all Nebraska School Districts" pertaining to the "1999–00 Fiscal Year and Beyond" prepared by the Nebraska Department of Education).) Thus, unlike other school districts (Class II–VI), Class I districts (elementary-only schools) derive their general fund budget authority from other political bodies. This unique dependence—Class I school districts must rely on other entities for money—is the crux of the plaintiffs' case.

"The first step in determining a Class I district's budget authority is the designation of a primary high school [district] for each Class I district." *Id.* at 4. The "primary high school district" is the "one Class II, III, IV, V or VI school district or the unified system with which the greatest share of the Class I district's assessed valuation is affiliated or of which such share is a part ...." Neb.Rev.Stat. Ann. § 79–1083.02 (Lexis 1999 Supp.).

There can only be one "primary high school district" and the "primary high school district" is determined by the Nebraska Department of Education pursuant to a statute. Neb.Rev.Stat. Ann. § 79–1083.02 (Lexis 1999 Supp.). That is, for each Class I district, the Department selects the "one Class II, III, IV, V or VI school district or unified system with which the greatest share of the Class I district's assessed valuation is affiliated or of which such share is a part ...." *Id.*

After the "primary high school district" is selected, then the budget authority of the Class I district is determined in two alternative ways. If the Class I district's "primary high school district" is a Class VI district—a high school only body—then that Class VI district establishes the Class I district's budget authority. Neb.Rev. Stat. Ann. § 79–1083.03(1)(a) (Lexis 1999 Supp.). This is true even though a Class I district may be associated with more than one Class VI district; that is, one "primary high school district" decides the budget authority although the Class I district may be associated with more than one Class VI high school district. *Compare id., with* Neb.Rev.Stat. Ann. § 79–1083.02 (Lexis 1999 Supp.). The "primary" Class VI district is under no restrictions or guidelines when establishing the Class I district's budget authority. (Ex. PL–2 at 5.) In this regard, a Class VI district has no incentive to discriminate among elementary-only districts since such a district does not maintain its own elementary schools.

In this case, Mr. Simmons is "a part of" Gordon and not Rushville, although his Class I school is associated with both school districts. Rushville is the primary high school district for Simmons' Class I district. Since Simmons is not "a part of" Rushville, Simmons cannot vote for the board of education that sets the budget authority for his Class I school. Simmons can vote, however, for the board of education for the high school district (Gordon) that he is "a part of." But, the Gordon district does not set Simmons' Class I general fund budget. Nevertheless, Simmons makes no claim and presents no evidence that Rushville has in fact discriminated against his Class I district. Put another way, Simmons does not claim that Rushville has acted, or will act in the future, to deny him tax equity, educational effectiveness, or cost efficiency.

On the other hand, if the Class I district's "primary high school district" is a Class II through V district—a K–12 district—then the Nebraska Department of Education establishes the budget authority for the Class I district. Neb.Rev.Stat. Ann. § 79–1083.03(2) (Lexis 1999 Supp.). The Nebraska Department of Education must use a calculation set forth in a statute. *Id.* In this way, Class I districts associated with K–12 districts are protect-

ed from discrimination by the K–12 districts as the State Board of Education sets the budget. There is, therefore, no opportunity as a result of this budget process for a K–12 district to discriminate in favor of its elementary schools to the detriment of a Class I elementary school.

Like other voters in other districts, registered voters in a Class I district may vote for at least one of the members of the State Board of Education. Neb.Rev.Stat. Ann. § 79–310 (Lexis 1997). Thus, Mr. Hawkins, Ms. Wondercheck, Mr. Wondercheck, Mr. Nicholls, and Mr. Kappas may vote for at least one of the people who set their Class I budget authority. They make no claim and present no evidence that the State Board of Education has discriminated, or will in the future discriminate, against them or their Class I districts.

## K. Exceeding the Budget (Spending) Authority

There are, of course, times when a school district may wish to exceed its general fund budget authority; that is, it wishes to spend more money than the budget allows. All classes of school districts may exceed their budget authority, but the enabling method is different for Class I districts as compared with Class II through VI districts.

Voters in Class II–V (K–12) and VI (high school) districts may, by a majority of voters at an election, decide to exceed the budget authority. Neb.Rev.Stat. Ann. § 79–1029(2) (Lexis 1999 Supp). To place the matter on the ballot in a Class II through VI district, one of two things must take place. The school board of a Class II through VI district may agree that the matter should be the subject of an election. Neb.Rev.Stat. Ann. § 79–1029(2) (Lexis 1999 Supp.). Or, if five percent or more of the "legal voters of the district" request, then the question of authority to exceed the budget limitation may be placed on the ballot. *Id.*

Whether "affiliated" with a Class II–V district or "part of" a Class VI district, the school board of a Class I district cannot vote to exceed the budget authority limitation. Neb.Rev.Stat. Ann. § 79–1083.03(3)(a)–(3)(b) (Lexis 1999 Supp.); (Ex. PL–2 at 16). In both cases (Class I "affiliated with" Class II through V or Class I being a "part of" a Class VI district), the authority to exceed the budget comes from the boards of the high school districts with which the Class I district is "affiliated" or a "part of." Neb.Rev.Stat. Ann. § 79–1083.03(3)(a)–(b) (Lexis 1999 Supp.).

In addition, for Class I districts "affiliated" with Class II–V districts, the parties agree that the Class I patrons may neither force the question of exceeding the budget to an election nor may they vote at such an election if one is held. (Tr. 2 at 25–27.) *See also* Neb.Rev.Stat. Ann. § 79–101(3) (Lexis 1999 Supp.); Neb.Rev.Stat. Ann. § 13–519(4)–(5) (Lexis 1999 Supp.); Neb. Rev.Stat. Ann. § 79–1029 (Lexis 1999 Supp.). The remedy for the "affiliated" Class I district or voter desiring to exceed the authorized budget is to make a request to the high school district(s) board(s). Neb.Rev.Stat. Ann. § 79–1083.03(3)(a)–(3)(b) (Lexis 1999 Supp.); (Ex. PL–2 at 17). Such a district or districts may grant or deny the request without elaboration or further review by the electorate. Neb. Rev.Stat. Ann. § 79–1083.03(3)(a)–(3)(b) (Lexis 1999 Supp.) If there is more than one high school district with which the Class I is "affiliated," budget authority may not be exceeded for the Class I school unless (1) the approving high school district(s) board(s) hold at least two-thirds of the Class I tax valuation and (2) the primary high school is one of the approving boards. *Id.*

Thus, five of the plaintiffs (the plaintiffs in the "affiliated" situation) cannot force, or vote at, an election on whether to exceed the budget authority for their Class I district. They must depend upon the school boards of the "affiliated" K–12 districts to agree with a request to exceed the budget authority for the "affiliated" Class I district. Again, there is no claim or

evidence that Class I schools have actually been discriminated against by the school boards of the "affiliated" K–12 districts. Similarly, there is no claim or evidence that such discrimination is likely to take place in the future.

For Class I districts that are a "part of" a Class VI district, the scenario is similar but also somewhat different. If a voter resides in the Class VI district which is the primary high school for the voter's Class I district, then the voter can vote for that Class VI board, sign a petition to exceed the budget and vote at the resulting election. Neb.Rev.Stat. Ann. § 79–101(3) (Lexis 1999 Supp.); Neb.Rev.Stat. Ann. § 13–519(4)–(5) (Lexis 1999 Supp.); Neb. Rev.Stat. Ann. § 79–1029 (Lexis 1999 Supp.). If the Class I voter does not reside in the Class VI district which is the primary high school for the voter's Class I district, then the voter cannot elect that Class VI board, he or she cannot sign a petition to exceed the budget, and he or she cannot vote at any election called in that district to alter the Class I district's budget authority. Neb.Rev.Stat. Ann. § 79–101(3) (Lexis 1999 Supp.); Neb.Rev. Stat. Ann. § 13–519(4)–(5) (Lexis 1999 Supp.); Neb.Rev.Stat. Ann. § 79–1029 (Lexis 1999 Supp.). Mr. Simmons falls in this latter situation; that is, he does not reside in the primary high school district and he therefore lacks the power to force, or vote at, an election in that district to exceed the Class I district's budget authority.

For people like Simmons, this issue is particularly confusing because of the association involving a Class I district and more than one Class VI districts. Since Simmons is a "part of" Gordon, a Class VI district, he could petition for, and vote at, an election called in *that* Class VI district to exceed the budget authority for his Class I district. However, it is the Rushville district that is the primary high school district for Simmons' Class I district, and it has the power to veto any request to increase the budget for Simmons' Class I district. Neb.Rev.Stat. Ann. § 79–1083.03(3)(a) (Lexis 1999 Supp.).

The Nebraska Department of Education has made clear that the "primary high school [district] must be among those high school districts agreeing to the request for the Class I district to receive approval." (Ex. PL–2 at 17.)

Thus, Simmons' Class I district must have the approval of the primary high school district (Rushville), where he cannot petition or vote, even if his Class VI district (Gordon), where he can petition and vote, approves the request for more Class I budget authority. However, like the other plaintiffs, there is no claim or showing by Simmons that he or his Class I district has actually been discriminated against by Rushville. Nor is there a claim or evidence that such discrimination will likely take place in the future.

### L. Tax Levies

In Nebraska, property taxes used to support the public schools are collected at the county level. The levies (the amount of tax that can be collected per dollar of taxable property) are limited by statute. Neb.Rev.Stat. Ann. § 77–3442(2)(a) (Lexis 1999 Supp.) (setting levy limit at $1.10 per $100 of valuation for schools until fiscal year 2001–02). Once a budget for a school is established (how much money will be spent), it is a ministerial function, completed by the county board, to set the levy (how much money can be collected) for the property that will be taxed to fund the budget. Neb.Rev.Stat. Ann. § 77–1601 (Lexis 1999 Supp). Every resident of a county can vote for the county board which sets the levy for the Class I district property situated in that county. Neb.Rev. Stat. Ann. § 32–528 (Lexis 1995); Neb. Rev.Stat. Ann. § 77–1601 (Lexis 1999 Supp.).

But what if a district wishes to exceed the levy lid? Every political subdivision, other than a Class I school district, may exceed the levy limitations under certain circumstances. Neb.Rev.Stat. Ann. § 77–3444 (Lexis 1999 Supp.) ("A political subdivision, other than a Class I school district, may exceed the limits ...."). The levy

may be increased if: (1) the voters of the district decide to do so after a resolution passed by the board of education has put the issue on the ballot; or (2) after a petition of registered voters has put the matter on the ballot and the voters adopt the measure. *Id.*

Consequently, a Class I district cannot increase the levy over the statutory ceiling. However, the associated Class II–VI district can in effect do so for the Class I district by authorizing an increase in the levy for both the Class I and the related district. (Ex. PL–2 at 31.)

As noted earlier, voters in a Class I "affiliated" district (like five of the plaintiffs here) cannot vote to elect the Class II–V board that has the power to put the levy matter on the ballot. Neb.Rev.Stat. Ann. § 79–101(3) (Lexis 1999 Supp.) (defining voter); Neb.Rev.Stat. Ann. § 77–3444 (Lexis 1999 Supp.) (authority to exceed levy). However, because the term "registered voter" in the "levy override" statute includes persons in an affiliated Class I district, Neb.Rev.Stat. Ann. § 77–3444(7) (Lexis 1999 Supp.), Class I voters can petition for, and vote at, an election to increase the levy for the affiliated (Class I and Class II–V) system. Neb.Rev.Stat. Ann. 77–3444(1)(b) (Lexis 1999 Supp.); Ex. PL–2 at 31 ("However, it should be noted that the patrons of a Class I district have the right to vote in an election to exceed the levy limitation held by the Class II–VI district with which their land is affiliated.").[4] Thus, the five "affiliated" plaintiffs can petition for and vote at an election called to decide whether the levy should be increased for the associated system.

As also noted earlier, voters in a Class I district that is a "part of" a Class VI district may vote for the Class VI school board that has authority to put the levy matter on the ballot if they reside in that Class VI district. Neb.Rev.Stat. Ann. § 79–101(3) (Lexis 1999 Supp.) (defining voter); Neb.Rev.Stat. Ann. § 77–3444 (Lexis 1999 Supp.) (authority to exceed levy). Since Mr. Simmons does not reside within the Class VI district that is the "primary" school district for budget setting purposes, it appears that he could not vote for the board that has the power to put a levy increase on the ballot.

Like their "affiliated" Class I counterparts, Class I voters that are a "part of" a Class VI district can petition for, and vote at, an election to increase the levy for the Class I district that is "part of" the Class VI district. Neb.Rev.Stat. Ann. § 77–3444(1)(b) (Lexis 1999 Supp.); Neb.Rev. Stat. Ann. § 77–3444(7) (Lexis 1999 Supp.); (Ex. PL–2 at 31). Thus, Simmons could petition for and vote at an election to decide whether to increase the levy even though he is not a resident of the primary high school district that sets the budget (that drives the levy) for the unified system of which his Class I district is a part.

Once again, and regarding the question of increasing levy limits, there is no claim or evidence by any of the plaintiffs that their Class I districts, or they as voters, have in fact been discriminated against by the districts with which their schools are associated. For example, the record fails to show that any Class I district, or the voters therein, have been, or will be, denied levy increases by a Class II–VI "primary high school district" board.

### M. Special Building Funds

Unlike other school districts, Class I district boards do not have authority to establish a special building fund tax of up to "seventeen and five-tenths cents" per hundred for the purpose of erecting, improving, and equipping school buildings and additions. Neb.Rev.Stat. Ann. § 79–1098 (Lexis 1999 Supp.) (authorizing a spe-

---

4. The parties agree that Class I voters can vote at such an election. The plaintiffs maintain that Class I voters cannot petition for such an election. Because the definition of "registered voter" in section 77–3444(7)(b) expands the meaning of "registered voters" in section 77–3444(1)(b) to include Class I vot-

ers, and those "registered voters" have the power to petition, *id.*, I do not agree with the plaintiffs. But, even if the plaintiffs are correct that they cannot petition for, but can vote at, such an election, my decision would be the same.

cial tax for all districts except Class I schools). *But see* Neb.Rev.Stat. Ann. § 79–1099 (Lexis 1997) (providing for submission of "the proposition described in section 79–1098" to the voters of the Class I district).[5]

However, Class I districts can, through their voters, levy a tax for building purposes, but the rate of tax that may be levied is less than the rate other districts may levy and the primary high school district must approve the plan. Neb.Rev. Stat. Ann. § 10,122 (Lexis 1999 Supp.) (authorizing tax for erection or repair of schoolhouses for Class I districts but limiting it to the amount described in section 79–10,124); Neb.Rev.Stat. Ann. § 79–10,124 (Lexis 1999 Supp.) (limiting certain special taxes ("not to exceed five cents" per hundred) and requiring approval of the board of the primary high school district).

For special building funds used to abate environmental hazards or eliminate obstacles that impede the disabled, Class I districts must also obtain the approval of their primary high school district before adopting and implementing those programs. Neb.Rev.Stat. Ann. § 10,124 (Lexis 1999 Supp.) (last paragraph). In addition, Class I districts cannot collect as much tax for these programs as can other districts. *Compare* Neb.Rev.Stat. Ann. § 79–10,110(3) (Lexis 1999 Supp.) (providing a tax rate for abatement of environmental hazards or accessibility barriers in an amount "not to exceed five and one-fifth cents per one hundred dollars" for all districts except Class I districts; limiting Class I district taxes for abatement of environmental hazards or accessibility barriers to those authorized in section 79–10,124), *with* Neb.Rev.Stat. Ann. § 79–10,124 (Lexis 1999 Supp.) (limiting rate to "five cents on each one hundred dollars").

Class I districts, like other districts, can issue bonds for building schools, making additions and or completing repairs. Neb. Rev.Stat. Ann. § 10–701 (Lexis 1995) (issuance of school district bonds). Of course, the practical ability to issue bonds is limited by the size of the budget and levy which is available to support the payment of the bonds.

There is no claim or evidence that any Class I district or the voters therein have been or will be harmed by the difference in treatment afforded Class I districts and special funds. For example, none of the plaintiffs claim that their Class I districts have been unable to abate environmental hazards or eliminate obstacles to the disabled because of the action or inaction of a primary high school district.

### N. Mergers, Dissolutions and Reorganizations

The plaintiffs also challenge a particular Nebraska law dealing with mergers, dissolution and reorganization of school districts as they pertain to certain Class I districts. But the defendants argue that this challenge was not identified in the pretrial conference order and should not be considered by the Court. I disagree with the defendants, and find that the issue was preserved for one statute. (*See* filing 35 (Pretrial Conference Order) ¶¶ C.1 & 2 (listing "79–4,110" as one of the alleged unconstitutional statutes).)

This preliminary issue having been resolved, I now turn to a description of the merger-dissolution-reorganization law in general and the challenged statute in particular. If possible, the Nebraska law on mergers, dissolution and reorganization of school districts is even more complex than the statutory framework regarding such things as budgets, levies or special building funds. Nevertheless, the plaintiffs helpfully limit their attack to Neb.Rev. Stat. Ann. § 79–4,110 (Lexis 1999). Therefore, only a brief overview of the law

---

**5.** Without deciding the question, and although it is not clear, it appears that section 79–1099 was effectively, but not formally, abrogated by the 1998 amendment to section 79–1098. The amendment to section 79–1098 removed the power of Class I districts to adopt the building fund described in section 79–1098. *See* Neb.Rev.Stat. Ann. § 79–1098 (Lexis 1999 Supp.) (historical note).

as it generally pertains to mergers, dissolutions and reorganizations is necessary as a prelude to discussion of the challenged statute.

### 1. An Overview

In general, school districts and their voters, including Class I districts, have discretion to merge, dissolve or reorganize. With certain exceptions, this right is not limited by the fact that a district is a Class I district. As before, the options for the plaintiffs are different for Class I districts (and voters) that are "affiliated" with Class II–V districts as compared with Class I districts (and voters) that are a "part of" Class VI districts.

A chart for the options available to plaintiffs Hawkins, Wondercheck, Nicholls and Kappas appears as Appendix A. Likewise, a chart for the options available to the school boards where plaintiffs Hawkins, Wondercheck, Nicholls and Kappas reside is attached as Appendix B.

For the plaintiff Simmons, a chart for the options available to him is attached as Appendix C. Appendix D describes the options available to Simmons' school board.

### 2. The Challenged Statute

The challenged statute, Neb.Rev.Stat. Ann. § 79–4,110 (Lexis 1999 Supp.), states:

A Class I district of which fifty percent or more of the district's valuation is affiliated with a single Class II or III district shall not merge, dissolve, or reorganize unless:

(1) The Class II or III district with which fifty percent or more of the Class I district's valuation is affiliated is also reorganizing in the same reorganization plan, petition, or election and that plan, petition, or election requires approval by either the school board or such legal voters of such Class II or III district;

(2) Fifty percent or more of the Class I district's valuation is being merged with such Class II or III district;

(3) The Class I district has been participating in a unified system for a minimum of seven school fiscal years and the unified system includes at least one Class II or III district reorganizing in the same reorganization plan or petition; or

(4) The school board of the Class II or III district with which fifty percent or more of the Class I district's valuation is affiliated votes to approve the plan or petition.

In summary, the statute prohibits a merger, dissolution or reorganization of certain Class I districts unless one of four requirements are satisfied. The requirements of section 79–4,110 apply only to the plaintiffs Nicholls, Kappas and Hawkins. This is because the plaintiffs have agreed that Nicholls, Kappas and Hawkins are the only ones whose Class I districts are fifty percent or more "affiliated" with a single Class II or III district and it is this relationship that triggers the statute.[6] As before, Nicholls, Kappas and Hawkins present no evidence and make no claim that their Class I districts have been, or will be, impeded to any degree in pursuing a merger, dissolution or reorganization made necessary by considerations of tax equity, educational effectiveness, or cost efficiency.

### II. ANALYSIS

To resolve the plaintiffs' case, I must answer three questions. Do the plaintiffs have standing? What is the proper level of scrutiny? Applying the proper level of scrutiny, do the statutes offend the Equal Protection Clause of the Fourteenth Amendment?[7]

---

**6.** *See* Pls.' Proposed Findings of Fact and Conclusions of Law ¶ 111.

**7.** I agree with the defendants that the plaintiffs have not made or preserved an independent First Amendment claim. *See* filing 35 (Pretrial Conference Order) ¶¶ C 2 & 3 (Plain-

tiffs' "Controverted Issues" raising only equal protection claims). Consequently, I disregard any First Amendment claims to the extent that they are independent of the more general Equal Protection arguments advanced by the plaintiffs. Fed.R.Civ.P. 16(e). There has been no showing of manifest injustice suffi-

## A. Standing

The parties assume that the plaintiffs have "standing." *See, e.g.*, 13 Charles Alan Wright, Arthur B. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 3531 (1984) (discussing "standing") (hereinafter 13 C. Wright, et al., *Federal Practice and Procedure* ). I am not permitted, however, to make that assumption. *United States v. Hays*, 515 U.S. 737, 742, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'") (alteration in original) (quoting *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 230–31, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990)).

■ The plaintiffs assert that their challenge is a "facial" attack.[8] For example, the plaintiffs do not offer evidence to prove that (1) their Class I districts have inadequate budgets; (2) that their Class I districts wish to exceed the budget or levy limitations[9]; (3) that their Class I districts have a need for and have been unable to collect and spend special building funds; or (4) that their Class I districts desire to merge, dissolve or reorganize. There is also no showing that in the future Class I districts, and their voters, will suffer when it comes to budgets, levies, building funds, or reorganization requests.

Moreover, the plaintiffs do not claim that they have attempted, or desire, to place any of these measures—budgets, levies, special building funds or merger, dissolution or reorganization—on the ballot so that they could vote on these questions. Likewise, the plaintiffs from the "affiliated" districts do not claim that they have attempted, or desire, to vote for any of the members of the Class II–V district boards.[10] The same is true for Mr. Simmons; that is, he does not claim that he has attempted to, or desires, to vote for the members of the Class VI district which is the "primary high school district" for his Class I district.

Still further, there is no evidence that any Class I district in the State of Nebraska has been hampered in the education of children as a result of the differences in treatment between Class I school districts and the other classes of school districts. As voters, the plaintiffs present no evidence and make no claim that they have in fact been denied tax equity, educational effectiveness, or cost efficiency. Nor do they suggest that such denials are likely to

cient to permit amendment of the pretrial conference order. *Id.*

8. During oral argument, the plaintiffs' counsel stated that this case "is not an applied challenge" but rather "this is a facial challenge." (Trial Tr. at 23.) As a result, he agreed that the plaintiffs must show that in "a substantial majority of the cases, [these statutes are] unconstitutional." (*Id.* at 23–24.) Because I find that the plaintiffs have standing regardless of the nature of the challenge, but I find that the statutes are constitutional, I do not pursue the "facial" versus "applied" issue any further. Two things are worth noting, however. First, if the plaintiffs had the burden generally imposed in cases involving facial challenges, they surely failed to carry it. *See, e.g., United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (noting special rules for First Amendment cases; evaluating challenge to Bail Reform Act; stating that when those special First Amendment rules do not apply, "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.") Second, because the parties agree that this case raises only a "facial" challenge, subsequent litigants would not be precluded from challenging a particular application of the statutes.

9. For example, the plaintiffs conceded that they "are not seeking any change in the distribution of state aid." Pls.' Supp'l Br. at 2.

10. As stated in their brief: "The Plaintiffs are not bringing this case on the theory that they should be allowed to vote for the boards of high school districts that have de facto control over their Class I district." Pls.' Supp'l Br. at 1–2. This concession by the plaintiffs makes clear that they do not claim a right to be included as voters in the other districts. In contrast, the plaintiffs insist that they have an equal protection right to maintain a separate geopolitical entity (the Class I district) that has same powers as every other district.

take place in the future. Finally, the plaintiffs do not claim to have school age children who have been harmed in any way as a result of the challenged statutes.

■ To have "standing" to bring a suit in federal court, a plaintiff must show three things: (1) "injury-in-fact"; (2) a causal connection between the injury and the defendants' actions, and (3) the injury will be redressed by a favorable decision. *See, e.g., Hays,* 515 U.S. at 742–43, 115 S.Ct. 2431. The plaintiff must show a distinct and palpable injury to himself; that this injury is caused by the challenged activity; and that this injury is likely to be redressed by a remedy that the court is prepared to give. *Id. See also McLain v. Meier,* 851 F.2d 1045, 1048 (8th Cir.1988) (viewed as a voter, a person who wished to stand for election as President of the United States had standing to challenge the constitutionality of North Dakota ballot access laws for presidential candidates even though the man was not qualified because of his age to serve as President if he were elected; applying three part standing test) (citing *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)).

Here, the difficult question is whether the plaintiffs have allegedly suffered any "injury-in-fact." If they have, then the other two facets of "standing"—causation and remedy—are met. As noted earlier, the plaintiffs do not claim to have been harmed in any way but one. They do claim that when they vote for their Class I school board officials, they are treated substantially differently (and worse) than other comparable voters because of their status as residents in a Class I district. Once again, it is important to emphasis that the plaintiffs do not claim an equal protection right to be included as voters in the other districts that they allege have de facto control over the Class I districts.

In essence, the plaintiffs claim that their Class I school boards have been emasculated and, as a result, the plaintiffs, as voters, have been denied equal protection of the laws when compared with other voters who can elect school boards that have not been so neutered. According to the plaintiffs, it is this "castration" of the Class I school boards that is also their "injury-in-fact." Is that rather abstract injury enough to confer standing? Viewed from the perspective of a voter bringing an equal protection claim, I believe so.

In a similar case, one Court of Appeals has assumed that voters like the plaintiffs have standing. *Mixon v. Ohio,* 193 F.3d 389 (6th Cir.1999). In *Mixon,* the Mayor of Cleveland appointed school board members, and that board ran a school district that served children both within and without the City of Cleveland. *Id.* at 404–05. Moreover, Ohio created a school district system where school board members in certain districts were elected while school board members in other districts (like Cleveland) were appointed. *Id.* at 402.

The challenged school district covered Cleveland and its suburbs such as Garfield Heights. The plaintiffs (a registered voter, parent and resident of Cleveland, and another registered voter, parent and resident of Garfield Heights) sued. They complained, among other things, of violations of their right to equal protection of the laws. Reaching the merits of the plaintiffs' equal protection claims, and resolving those claims against the plaintiffs, *id.* at 402–06, the Court of Appeals for the Sixth Circuit assumed that they had standing. *Id.* at 393–94 n. 1.

Like the court in *Mixon,* I believe that these plaintiffs have standing.[11] To be specific, and taking care to distinguish between a decision on standing and a decision on the merits, the plaintiffs have alleged a sufficient "injury-in-fact." That is,

---

11. As noted earlier, the plaintiffs do not claim to have school age children. I do not find this fact significant for standing purposes, however, since the basis of the plaintiffs' claim is a denial of their equal protection rights as voters and not as parents of children.

when qualified voters claim that the power of their vote is less than other voters based upon their state's different treatment of other allegedly comparable voters, then those plaintiff-voters have standing to raise an equal protection claim. To have standing, they are not required to allege an "injury-in-fact" that is more particular than a personal inequality of voting strength.[12] This decision is in keeping with liberalized standing principles that have generally been adopted in voting rights cases premised upon equal protection claims. *See, e.g., Baker v. Carr,* 369 U.S. 186, 207–08, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (in holding that voters had standing to challenge apportionment scheme for the legislature, court noted: "[t]he injury which appellants assert is that this classification disfavors the voters in the counties in which they reside, placing them in a position of constitutionally unjustifiable inequality vis-a-vis voters in irrationally favored counties."); 13 C. Wright, et al., *Federal Practice and Procedure* § 3531.4 at 427–28 n. 19 (collecting cases).

### B. The Level of Scrutiny

■ In order to decide what level of scrutiny to apply, I must first discuss the "Lewis Rule." Then I must decide which of two Supreme Court opinions is applicable.

#### 1. The "Lewis Rule"

■ Before answering the question of what level of scrutiny is appropriate, a closely related matter must be addressed. According to the "Lewis rule," the Equal Protection Clause protects people and not places, such as political subdivisions of a state. *See, e.g., Missouri v. Lewis,* 101 U.S. 22, 30–31, 25 L.Ed. 989 (1879) (upholding Missouri law that gave all citizens in the state, except for those in four counties and in the City of St. Louis, a right of appeal directly to the Missouri Supreme Court).

■ Applying this principle, our Court of Appeals has reminded us that "Equal protection does not apply to legislative distinctions between political subdivisions." *Von Kerssenbrock–Praschma v. Saunders,* 121 F.3d 373, 378 n. 3 (8th Cir.1997), (a Missouri law that prevented a German alien from transferring his farmland to a son was not unconstitutional even though the law did not apply to land in two other Missouri counties). Or perhaps more precisely: "[T]he Supreme Court has long held that when the state chooses to regulate differentially, with the laws falling unequally on different geographic areas of the state, the Equal Protection Clause is not violated so long as there is no underlying discrimination against particular persons or groups." *Reeder v. Kansas City Bd. of Police Comm'rs,* 796 F.2d 1050, 1053 (8th Cir.1986) (a statute which prohibited policemen in a particular city from participating in or contributing money to political causes, but which had no effect on policemen in other cities throughout the state, did not violate the officers' right to equal protection) (citations omitted), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 951, 93 L.Ed.2d 1000 (1987).

In summary, the *Lewis* rule applies where the statutory rights of citizens of a state are unequal because of the way in which that state has created and empowered political subdivisions. The *Lewis* doctrine stands for the proposition that such inequality of power does not (1) warrant an inference that the Equal Protection Clause is violated or (2) permit the court to ignore the separate identities and boundaries of the subdivisions when it conducts an equal protection analysis. Therefore, in deciding what level of scrutiny to apply, we start with the assumption that the State of Nebraska is free to create political subdivisions even though Nebraska's law lands unequally on the residents of those subdivisions. To put it simply,

---

**12.** They must, however, reside within the district where the alleged discrimination arises. *Hays,* 515 U.S. at 745, 115 S.Ct. 2431 (to have standing, a voter must reside within the district that he is challenging as racially gerrymandered). Here, the plaintiffs reside in Class I districts, and that is where the alleged discrimination is said to take place.

the court should not be suspicious of differences created by political subdivisions.

## 2. *Kramer* versus *Holt*

The plaintiffs assert that I must apply "strict scrutiny" to the challenged statutes and they rely upon *Kramer v. Union Free School District,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) for that proposition. The Court, in *Kramer,* held that a resident and a taxpayer of a school district who was not allowed to vote for the school board because he did not have children and he did not own or lease property in the school district was deprived of equal protection of the laws when compared with other residents (parents of children or land owners/lessees) who were allowed to vote. *Id.* at 630–33, 89 S.Ct. 1886. In arriving at this result, the Court used strict scrutiny to evaluate the New York statutes. *Id.* at 625–30, 89 S.Ct. 1886.

The defendants respond that the proper level of scrutiny is "rational basis" review and they rely upon *Holt Civic Club v. City of Tuscaloosa,* 439 U.S. 60, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978), as authority. In *Holt,* a civic association and individual residents of Holt, Alabama, a small community outside the corporate limits of Tuscaloosa but within three miles thereof, brought suit. They challenged the constitutionality of statutes that extended the municipal jurisdiction of Tuscaloosa (police, sanitary and business licensing powers) over residents of Holt who lacked the power to vote in the Tuscaloosa city elections. The Court found no equal protection violation. *Id.* at 70–75, 99 S.Ct. 383. Distinguishing *Kramer* on the basis that the residents of Holt did not reside in Tuscaloosa, the Court employed a rational basis level of scrutiny. *Id.* at 66–70, 99 S.Ct. 383.

Is *Kramer* or *Holt* applicable? The Sixth Circuit Court of Appeals in the *Mixon* case provides the answer. The court said:

> The lesson of *Holt* and *Kramer* is an important one: If residents of the relevant jurisdiction are excluded from participation, as in *Kramer,* then the court subjects the legislation to strict scrutiny.

If, however, the legislation merely concerns extraterritorial jurisdiction over nonresidents, courts employ rational basis review, granting the States wide latitude to create political subdivisions and exercise state legislative power.

193 F.3d at 405.

The same thing is true here. Class II–VI districts have "extraterritorial jurisdiction over nonresidents," but, like *Holt,* each of the associated political subdivisions (the Class I districts and the Class II–VI districts) are permitted to maintain their separate identity and, like *Holt,* all of the plaintiffs are non-residents of the Class II–VI districts that allegedly have de facto control. Unlike *Kramer,* the plaintiffs do not claim that some citizens within Class I districts have voting rights that other citizens within those same Class I districts do not enjoy. For example, Mr. Wondercheck does not claim that his equal protection rights have been violated because Mr. Hawkins enjoys a right that Wondercheck lacks. Indeed, the theory of *all* the plaintiffs is that they have been denied their equal protection rights because voters in *other* classes of school districts (Class II–VI) have voting power over them.

Therefore, since all the plaintiffs, residents of Class I school districts, claim that the voters and residents in other types of school districts (Class II–VI) have greater powers which are extraterritorial in nature, *Holt* rather than *Kramer* applies. And, as a result, rational basis scrutiny, rather than strict scrutiny, is the method which must be used to evaluate the plaintiffs' facial challenge to the Nebraska statutes.

## C. Rational Basis Scrutiny

I must initially state what "rational basis" review means. Then I must apply it. I proceed to those tasks next.

### 1. The Meaning of "Rational Basis"

"Absent a 'suspect classification' such as race, courts review legislative actions under the highly deferential 'rational basis' standard." *Batra v. Board of Regents,* 79

F.3d 717, 721 (8th Cir.1996) (citation omitted). This means the "legislation ... must be rationally related to a legitimate governmental purpose." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 446, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

While "rational basis" review is "highly deferential," the legislative power of a state is limited under that standard. Initially, the "State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *Id.* (citation omitted). Moreover, the state may not legislate based upon a " 'desire to harm a politically unpopular group' " because such a motive is not a "legitimate state interest[ ]." *Id.* at 447, 105 S.Ct. 3249 (citation omitted).

### 2. "Rational Basis" Scrutiny Applied

■ Applying these principles to the facts, the plaintiffs' equal protection challenges must fail. This is true whether each of the challenged statutes is viewed in isolation or whether the statutes are viewed together.

My reasons for this conclusion are set forth below. In so doing, I first summarize the material facts. Then I set forth clarifying principles. Next, I decide whether the Nebraska statutes are based upon a legitimate governmental purpose. Lastly, I examine the "fit" between the governmental purpose and the statutes.

### Facts

For some, but not all, purposes, it is true that voters in Class I school districts lack the power to elect Class I school boards that have the same or similar powers that Class II–VI school boards enjoy. In a similar vein, it is true that Class I voters lack the same powers to require their Class I school boards to put matters on the ballot that voters in other types of school districts enjoy regarding their school boards. It is also true that both Class II–VI voters and Class II–VI school boards have the power to control how Class I districts operate in many important areas. Moreover, it is true that non-residents of Class II–VI districts, such as the plaintiffs who are residents of Class I districts, do not enjoy the right to vote in Class II–VI districts for most purposes. Specifically, the plaintiffs and their Class I school districts, when compared with Class II–VI voters and districts, are limited in their abilities to: (1) set their own school budgets and to exceed the general fund budget authority once it is established; (2) exceed tax levies; (3) authorize and spend special fund monies; and (4) merge, dissolve or reorganize.

### Clarifying Principles

■ Where a state's differential treatment of school districts and their voters is challenged on equal protection grounds, two principles clarify the required examination. First, there is no fundamental right to elect a school board even if voters in other political subdivisions of a state may do so. *Mixon*, 193 F.3d at 403 (citing *Sailors v. Board of Educ.*, 387 U.S. 105, 108, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967)). Second, non-residents of a political subdivision (like the plaintiffs) do not have the right to vote in that subdivision's elections simply because that entity has authority over the non-residents for certain purposes. *Id.* at 405 (citing *Holt*, 439 U.S. at 69, 99 S.Ct. 383).

### Governmental Purpose

In adopting the challenged laws, and requiring an association between elementary-only districts and other districts, it was the intent of the Nebraska legislature, explicitly expressed in the statutes, to "reorganize" Class I districts. Neb.Rev.Stat. Ann. § 79–402(2) (Lexis 1997). That assembly believed the reorganization would contribute "to the objectives of tax equity, educational effectiveness, and cost efficiency." Neb.Rev.Stat. Ann. § 79–401 (Lexis 1997). *See also* Neb.Rev.Stat. Ann. § 79–401 (Lexis 1999 Supp.) (operative July 1, 2000).

The record is replete with evidence showing the legislature was concerned that the 300 or so elementary-only school districts were costly and that they should be

treated for funding purposes no better than K–12 schools. For example, Senator Beutler observed:

> Under the bill the way it is now [without an amendment], the K–12 would have budgetary authority [over the Class I districts] . . . I think that is a decision that a K–12 system should have, and I think it is a question where there's a very acute question of efficiency. . . . . [T]here are almost 150 Class I districts that have ten or fewer students. . . . I do not understand why we want to continue to put a straight jacket on a K–12 system when we're dealing with all of these systems that have four, five, six, seven students, and obviously have to be expensive because they have to have one teacher. Just having the one teacher makes them, generally speaking, twice as expensive as other school systems, on the average.

Ex. 26 at 5037–5038.

On the other hand, the record is overflowing with evidence that the legislature was sensitive to the values that Class I districts promoted. For example, one legislator, decrying the distance students would have to travel if Class I districts were closed, noted that his grandchild had scored exceptionally well on a national mathematics test as a result of her schooling in a small Class I district. (Ex. 26 at 5053–54.)

If anyone doubts the significance of Class I schools in Nebraska, he or she should recognize that one of the most popular documentaries produced in recent years by Nebraska Educational Television dealt with the statewide nostalgia for one-room schools. "Last of the One Room Schools," a 1996 documentary produced by Joel Geyer for Nebraska Public Television, won, among other awards, the Heartland Regional Emmy from the National Academy of Television Arts and Sciences in the "Documentary: Artistic or Cultural" category. <http://net.unl.edu/member-Feat/awards .html>. The public affection and concern for rural schools continues. *See, e.g.,* Brad Penner, *Memories of Burr Oak: Closed Rural Schoolhouse Embraced a Tradition, Statewide* (May 7, 1999), available at <http: //net.unl.edu /swi/pers/burroak.html>.

As a result, the legislature faced a difficult dilemma. It made sense to view the education of children as a continuing enterprise from kindergarten through high school, but it was also advisable to keep the various types of districts separate. Furthermore, it was necessary to limit the amount of spending on the education of children from kindergarten through high school, and to impose a single funding limit on all schools, whether a school performed all or only part of the total educational task. How could one preserve the separate identities of the districts, particularly the identity of the Class I districts, and still impose a single funding limit?

To answer this dilemma, Nebraska decided to compromise and then experiment. The innovative device used to solve the problem was the retention of a modified form of Class I district that was partially controlled by a geographically distinct school district that was obligated to provide a high school education to the children graduating from the Class I district. It made sense to put much of the decision making power about funding in the geographically distinct district providing the high school education since it was that district that was responsible for the "finished product."

As the Supreme Court has recognized, in order to meet changing conditions, "[v]iable local governments may need many innovations, numerous combinations of old and new devices, [and] great flexibility in municipal arrangements . . . ." *Sailors,* 387 U.S. at 110–11, 87 S.Ct. 1549 (holding that there was no constitutional reason why nonlegislative state or local officials, like school board members, must be elected). "We see nothing in the Constitution to prevent [such] experimentation." *Id.* at 111, 87 S.Ct. 1549.

In summary, Nebraska had a legitimate governmental purpose behind the challenged statutes. By using an ·ingenious strategy, Nebraska hoped to promote tax equity, educational effectiveness, and cost efficiency while still maintaining the separate identities of various political subdivisions.

### The "Fit" Between the Goals and the Statutes

While one can argue whether Nebraska made the right choice, the relationship between the governmental purpose and the challenged statutes is neither arbitrary nor irrational. *City of Cleburne*, 473 U.S. at 446, 105 S.Ct. 3249. That is, the "fit" is not too "attenuated." *Id.* In this regard, two additional points should be made.

First, like every other voter in a Nebraska school district, a Class I voter has the right to vote for and elect a school board that performs important functions. For example, just like Class II–VI districts, Class I district boards, elected by Class I district voters, may hire and fire their own teachers. In addition, Class I voters have the same right to vote for governor, legislative representative and member of the state board of education as do Class II–VI voters. The fact that Class I voters have not been disenfranchised from participating in a broad range of local and statewide political questions relating to education proves the rationality of the legislative scheme challenged in this case. *See Mixon*, 193 F.3d at 406 (in a municipal school district where city residents could vote for the mayor who appointed the school board, but nonresidents of the city, who were patrons of the school, could not vote, the fact that nonresidents could "use their elective voice to challenge state legislators and the governor" tended to establish rationality of the municipal school district system).

Second, the plaintiffs' complaint boils down to a condemnation of the dependence of their Class I school districts on other political bodies for budgets, levies, special funds, and mergers, dissolutions or reorganizations. There is no evidence that a single Class I district school has received funds that are disproportionally less than other similar schools in other districts. In the same vein, there is no evidence that any Class I district or voter has been denied the ability to merge, dissolve or reorganize. There is no showing that the legislative scheme has denied, or will deny in the future, Class I voters tax equity, educational effectiveness, or cost efficiency. Finally, there is no showing that Class I districts or voters are likely to be the subject of discriminatory treatment of any kind by Class II–VI boards or voters.

The fact that plaintiffs have offered no proof of irrationality, beyond the mere difference in treatment, requires that I find for the defendants. There is a presumption of validity, and the plaintiffs have the burden to prove otherwise. *See, e.g., Knapp v. Hanson*, 183 F.3d 786, 789 (8th Cir.1999) ("[U]nder a rational basis standard of review, the statute at issue carries with it a 'strong presumption of validity.'") (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 314, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)); *Red River Service Corp. v. City of Minot*, 146 F.3d 583, 590 (8th Cir.1998) (to prove a claim under the rational basis standard of equal protection analysis, the party bringing the claim "has the burden of proving 'that the classification is so attenuated to its asserted purpose that the distinction it draws is wholly arbitrary and irrational'") (quoting *Chance Mgt., Inc. v. South Dakota*, 97 F.3d 1107, 1114 (8th Cir.1996), *cert. denied*, 519 U.S. 1149, 117 S.Ct. 1083, 137 L.Ed.2d 217 (1997)). When a rational basis standard applies in the equal protection context, it is not enough to rely only upon different treatment.

In summary, the plaintiffs' complaint is merely that other political subdivisions, and therefore the voters of those subdivisions, have certain controls over Class I school districts and their voters. In the words of the Supreme Court, this type of derivative voting rights argument "proves too much." *Holt*, 439 U.S. at 69, 99 S.Ct.

383. The Equal Protection Clause does not prohibit state legislatures from giving one political subdivision power over another and, where both entities have voters, that, of necessity, means that some voters will have power over others for certain purposes. *Holt,* 439 U.S. at 71, 99 S.Ct. 383 (noting that States have "extraordinarily wide latitude ... in creating various types of political subdivisions and conferring authority over them") (quoting *Hunter v. Pittsburgh,* 207 U.S. 161, 178, 28 S.Ct. 40, 52 L.Ed. 151 (1907) ("The number, nature and duration of the powers conferred upon [municipal corporations] and the territory over which they shall be exercised rests in the absolute discretion of the State.")); *Mixon,* 193 F.3d at 405 ("*Holt* thus illustrates that non-residents do not necessarily have the right to vote in [another subdivision's] election simply because the [other subdivision] has some limited authority over the non-residents.").

## III. CONCLUSION

The Equal Protection Clause of the Fourteenth Amendment does not require a federal court to "tie the hands of state legislators who must try innovative solutions for fixing public education." *Mixon,* 193 F.3d at 404. Nebraska's innovation in the reorganization of Class I school districts is rationally related to a legitimate governmental purpose and such an experiment is, therefore, not violative of the Constitutional guarantee of equal protection.

IT IS ORDERED that judgment will be entered, by separate document, for the defendants and against the plaintiffs providing that plaintiffs shall take nothing, their suit is dismissed with prejudice, and costs are taxed to them.

**OPTIONS AVAILABLE TO PLAINTIFFS**
**HAWKINS, WONDERCHECK, NICHOLLS, AND KAPPAS**
**APPENDIX A**

Initiate and participate in a voter petition to dissolve the Class I district and attach it to an existing district or districts under the petition process of § 79–413, thereby becoming a K–12district in full.

Initiate and participate in a voter petition to dissolve the Class I district and attach it to another district under the processes described in §§ 79–452 through 79–455.

Request the governing board of the Plaintiff's respective Class I district to initiate its own petition to merge with a high school district under §§ 79–415, 79–418 and 79–419.

Based upon stipulated facts, only Plaintiffs Hawkins, Nicholls, and Kappas would be subject to the limitations of § 79–4,110.

Request the governing board of the Plaintiff's respective Class I districts to adopt a plan of reorganization to merge with a Class II, III, IV, or V district for submission at a special election under the processes described in §§ 79–432 through 79–451.

Under § 79–413(2)(a), any Plaintiff could petition their school board and another Class

II, III, IV, or V district board for the transfer of their land, not exceeding 640 acres, from their current Class I district to any other Class II, III, IV or V district.

Could vote to establish a high school, thereby ceasing to be a Class I district and, therefore, ceasing to be a part of the system(s), under § 79–406, subject to § 79–472(2).

## OPTIONS AVAILABLE TO THE SCHOOL BOARDS WHERE PLAINTIFFS HAWKINS, WONDERCHECK, NICHOLLS, AND KAPPAS RESIDE
### APPENDIX B

Initiate its own petition to another district's board to attach to such other district under § 79–415, (a "board-to-board" petition).

Based upon stipulated facts, only the boards in the districts where Plaintiffs Hawkins, Nicholls, and Kappas reside would be subject to the limitations of § 79-4, 110.

Adopt a plan of reorganization for submission at a special election under the processes described in §§ 79–432 through 79–451.

Could have the issue of establishing a high school put to a vote under § 79–406, subject to § 79–472(2). If established, the Class I district would cease to exist, and therefore no longer need be in a system.

Could approve a petition to transfer any parcel of land of any Plaintiff, 640 acres or less, to another district under § 79–413(2)(a).

Could initiate an interlocal agreement to create a "unified system" for submission to other district's boards in accordance with §§ 79–4,108 through 79–4,111.

## OPTIONS AVAILABLE TO PLAINTIFF SIMMONS

### APPENDIX C

Could initiate and participate in a voter petition to dissolve the Class I district and attach it to an existing district or districts under the petition process of § 79–413, thereby ceasing to be a Class I and becoming part of a K–12 district.

Could request the governing board of plaintiff's Class I district to initiate its own petition to merge with a Class II, III, IV or V district under §§ 79–415, 79–418, and 79–419 (a "board-to-board" petition).

Could request the governing board of plaintiff's Class I district to adopt a plan of reorganization to merge with a Class II, III, IV, or V district for submission at a special election under the processes described in §§ 79–432 through 79–451.

Could, under § 79–413(2)(a), petition the Plaintiff's school board and another Class II, III, IV, or V district's board for the transfer of their land, up to 640 acres, from their current Class I district to another Class II, III, IV, or V district.

Could vote to establish a high school, thereby ceasing to be a Class I district and therefore not part of any system, under § 79–406, subject to ¶ 79–472(2).

## OPTIONS AVAILABLE TO THE SCHOOL BOARD WHERE PLAINTIFF SIMMONS RESIDES

### APPENDIX D

Initiate its own petition to another district's board to attach to such other district under § 79–415 (a "board-to-board" petition).

Adopt a plan of reorganization for submission at a special election under the processes described in §§ 79–432 through 79–451.

Could have the issue of establishing a high school put to a vote under § 79–406, subject to § 79–472(2). If established, Class I district would cease to exist, and therefore

would no longer need to be in the current system(s).

Could approve the transfer of any parcel of land, including Plaintiff's, 640 acres or less, to another district under § 79–413(2)(a).

Could initiate an interlocal agreement to create a "unified system" for submission to other district's board in accordance with §§ 79–4,108 through 79–4,111.